GUY OWENS *v.* NEW BRITAIN GENERAL HOSPITAL
(10654)

FOTI, LANDAU and SCHALLER, Js.

---

Argued February 16—decision released July 13, 1993

*William F. Gallagher,* with whom, on the brief, were *Barbara L. Cox* and *Dennis N. Garvey,* for the appellant (plaintiff).

*Theodore J. Tucci,* for the appellee (defendant).

FOTI, J. This appeal arises out of an action brought by the plaintiff against the defendant New Britain General Hospital following the hospital's decision to terminate the plaintiff's medical staff privileges. The plaintiff sought damages resulting from an alleged breach of contract and negligent infliction of emotional distress as well as injunctive relief in the form of reinstatement of his staff privileges. After a lengthy trial to the court, judgment was rendered for the hospital. The plaintiff now appeals. Although he raises six sep-

arate claims,[1] the first five fall under two main headings: (1) the trial court improperly found that the hospital had not breached its contractual bylaw obligations to provide him with adequate notice of the charges against him; and (2) the trial court improperly found that the hospital had not breached its contractual bylaw obligations to provide him with a fair opportunity to respond to the charges against him. The plaintiff's final claim is that the trial court improperly determined that the cumulative effect of the hospital's several procedural violations did not deprive him of due process and fair procedure. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. The plaintiff, Guy Owens, is a neurosurgeon who had surgical privileges at New Britain General Hospital for many years until the time of the hospital's decision not to reappoint him to the medical staff in 1986. In 1982, Gerald O. Strauch, then chief of the department of surgery, initiated a review of the neurosurgery section of the hospital staff, which at the time was headed by the plaintiff. The review was conducted in November, 1982, by two neurologists, William F. Collins, Jr., and Edward B. Schlesinger. Their report (Collins-Schlesinger report) concluded that the plaintiff was surgically intervening with disc operations in cases where the criteria for intervention were less stringent than Collins and Schlesinger considered to be appropriate.

[1] In his statement of issues, the plaintiff claims that the trial court improperly concluded that (1) the hospital had not breached its contractual bylaw obligations, (2) the hospital had not breached its contractual bylaw obligations to provide him with adequate notice of the charges against him, (3) a meeting of the hospital's staff executive committee was a proceeding under article V of the medical staff bylaws, (4) the hospital had not breached its contractual bylaw obligation to provide him with a fair opportunity to respond to the charges against him, (5) he was able to respond to a report, and (6) the hospital had not breached its contractual bylaw obligation to provide him with due process and procedural fairness.

The plaintiff and the other neurosurgeons at the hospital were notified of the report and of Strauch's intent to implement its several recommendations.

Effective April 1, 1983, Strauch implemented a program, to which the plaintiff voluntarily agreed in writing, whereby second opinions would be required before the plaintiff performed disc surgery. A requirement for mandatory psychiatric consultations for patients who were to undergo certain other procedures performed by the plaintiff was also imposed. Richard Simon, a neurosurgeon at the University of Connecticut Health Center, was charged with monitoring implementation of the Collins-Schlesinger review process. For several months, the plaintiff complied with the restrictions enacted pursuant to the Collins-Schlesinger report. Thereafter, however, he advised Strauch that he would no longer comply with the restrictions.

Simon's first report was submitted in early 1984, covering neurosurgical cases from April and May of 1983. Strauch asked the plaintiff to respond to the report, and he did so. A more definitive report from Simon was received by Strauch in January, 1985, covering a fourteen month review of the plaintiff's cases (Simon report). In February, 1985, Strauch furnished the plaintiff with this report, which concluded that the plaintiff had not followed the Collins-Schlesinger restrictions as to second opinions and consultations. Strauch then advised the plaintiff that he would have until March 21, 1985, to prepare a response before any corrective action was taken against him.

When it became clear to the plaintiff that he needed more time to respond adequately to the Simon report, he requested and was granted an extension until August 1, 1985. On August 3, 1985, the plaintiff brought Strauch a large box of materials. The plaintiff indicated that this box contained his rebuttal to each

of the 157 case analyses in the Simon report as well as a written summary of his neurosurgical experience at the hospital.

On September 19, 1985, Strauch advised the plaintiff of his intent to seek corrective action. On September 20, 1985, Strauch submitted to the hospital's staff executive committee a formal recommendation for corrective action against the plaintiff. The executive committee then requested that Strauch appoint a three person ad hoc committee to conduct a preliminary investigation into the matter, as required by the medical staff bylaws. Strauch did so, and advised the plaintiff that he would be hearing from the ad hoc committee, chaired by physician William Waskowitz, regarding a meeting to discuss the matter. The plaintiff then requested that the box of materials he had turned over to Strauch be returned to him before his meeting with the committee. Strauch advised the plaintiff that the box had been turned over to the Waskowitz committee.

On October 10, 1985, the Waskowitz committee invited the plaintiff to appear before it prior to its submission of a report to the executive committee, which, pursuant to the bylaws, was due on October 20, 1985. The plaintiff advised Waskowitz that he would not meet with the committee if he could not get back his materials by October 14, 1985. On the advice of hospital staff, however, Waskowitz told the plaintiff that the documents could not be released. The committee thus met without interviewing the plaintiff. After meeting on six occasions, the Waskowitz committee filed its report with the executive committee on October 18, 1985, recommending that the executive committee implement Strauch's request for corrective action. The plaintiff's box of records was later returned to him. The executive committee then voted to accept the report of the Waskowitz committee regarding corrective

action but to defer action on the recommendation to impose restrictions on the plaintiff's practice. The plaintiff was advised accordingly.

On October 29, 1985, George H. Bray, the hospital's chief of staff and chair of the executive committee, advised the plaintiff that the executive committee had met on October 28, 1985, to review the Waskowitz report and Strauch's recommendations. The plaintiff was also advised that he would have an opportunity to appear informally at the executive committee's November 15, 1985 meeting to discuss these matters before any corrective action was undertaken. Bray requested that, until these issues were resolved, the plaintiff strictly comply with the restrictions on his practice as recommended by Strauch and the Waskowitz committee. The plaintiff agreed in writing to abide by the restrictions.

On November 5, 1985, Bray provided the plaintiff with a copy of the Waskowitz committee's report and reiterated that the November 15, 1985 executive committee meeting would be an informal proceeding at which the plaintiff would have the opportunity to present material in response to both Strauch's recommendation and the Waskowitz report. He advised the plaintiff that because of the informal nature of the interview, patients would not be allowed to participate. Bray also advised the plaintiff that in making its report the Waskowitz committee considered the Collins-Schlesinger report, the Simon report, and approximately thirty-five additional cases, the names of which had since been supplied to the plaintiff.

The executive committee met on November 15, 1985, at which time the plaintiff participated in lengthy discussions with the committee. On November 21, 1985, the plaintiff was advised that as a result of its informal review of his practice the executive committee had

voted to impose restrictions on his surgical practice. The notice also detailed requirements for monitoring the plaintiff's compliance with the restrictions. Thereafter, the plaintiff exercised his right under the bylaws to a hearing on the executive committee's decision to impose these restrictions on his practice; the effect of this appeal was to stay imposition of the November 21 restrictions.

Another ad hoc committee, chaired by Thomas J. Devers, was formed (Devers committee). On January 6, 1986, Bray advised the plaintiff that the executive committee expected him to comply with the restrictions outlined in Bray's October 29, 1985 letter, to which the plaintiff had previously agreed. On January 9, 1986, Bray advised the plaintiff of the time and place for the first Devers committee hearing; he also reiterated the list of nine problem areas that had been identified by the executive committee in its November 21, 1985 notice to the plaintiff and provided a list of additional cases that were the subject of reviews of the plaintiff's practice.

Over the next several months, the executive committee closely monitored the plaintiff's cases for compliance with the October 29, 1985 restrictions, periodically pointing out to him where he had failed to comply. On February 8, 1986, the executive committee convened a special meeting to review seven of these noncompliance cases. Bray later advised the plaintiff that, while the executive committee did not intend to change the October 29, 1985 restrictions to which he had agreed, it was providing certain specifics to enable the plaintiff to meet these requirements; the letter from Bray then enumerated these specifics.

The Devers committee conducted a series of formal hearings during January and March, 1986, during which it took evidence pertinent to the executive com-

mittee's decision to impose restrictions. The plaintiff was present at all sessions, accompanied by counsel, and was given an opportunity to submit written and oral evidence. On April 15, 1986, the Devers committee, having completed the formal hearing process, issued a report unanimously recommending that the executive committee's November 21, 1985 decision to impose restrictions on the plaintiff's practice be confirmed. The plaintiff was so advised, and he thereafter exercised his right to appellate review of that decision.

On May 16, 1986, Bray advised the plaintiff that the executive committee had been presented with a letter from Ali Nourizadeh, another neurosurgeon on the hospital staff, raising several charges against the plaintiff. Bray advised the plaintiff that if the validity of these charges was confirmed, the executive committee was disposed to take firm corrective action. Shortly thereafter, Bray advised the plaintiff that the executive committee had completed an investigation of these charges and would be conducting a special meeting on May 30, 1986, at which time it would receive the plaintiff's written or oral rebuttal. The plaintiff was advised that "the potential consequences of this meeting could be so serious, including suspension from the staff." Because of the plaintiff's vacation plans, the meeting was postponed until June 9, 1986. Bray provided the plaintiff with a copy of Nourizadeh's letter of complaint.

On June 6 and 9, 1986, the executive committee met to discuss applications for reappointment to the hospital staff. At the June 6 session, at which the plaintiff was not present, the executive committee voted to reappoint him to the medical staff with the restrictions outlined in the executive committee's October 29, 1985 letter. At the June 9 session, the executive committee heard from the plaintiff as to the charges by Nourizadeh. After this discussion, the executive committee deliberated. A motion was made and the executive commit-

tee voted to recommend that the plaintiff not be reappointed to the medical staff as of July 1, 1986, superseding its June 6 vote. The plaintiff was notified of this decision on June 10, 1986, and advised of his right to a hearing on that decision pursuant to article V of the bylaws. Thereafter, the plaintiff availed himself of his right to a hearing on the reappointment matter.

In late June, 1986, the plaintiff withdrew his request for review of the executive committee's decision to impose restrictions on his practice, the effect of which was immediate imposition of the November 21, 1985 restrictions. A three member committee then began monitoring the plaintiff's practice for compliance with those restrictions.

Another ad hoc committee, chaired by Martin Dinep (Dinep committee), was formed to review formally the executive committee's decision to recommend nonreappointment. On July 30, 1986, the president of the hospital, Stanley W. Shepard, advised the plaintiff of the time and place of the hearing. Shepard also advised the plaintiff by letter that the executive committee had recommended that he not be reappointed for four specific reasons.[2] Prior to the first scheduled hearing, the plaintiff's counsel requested that Nourizadeh be invited to attend the hearing, since part of the claim involved concerns with respect to him. The plaintiff, accompanied by counsel, was present at the first and each subsequent hearing. Nourizadeh did not attend. During

---

[2] Shepard's letter stated:

"The Staff Executive Committee has recommended that you not be reappointed because:

"a. You have demonstrated a pattern of disregard for hospital procedures, policies and patients' rights;

"b. You harassed a physician on the medical staff on or about March 20, 1986;

"c. You harassed a patient on March 20, 1986;

"d. You operated on another physician's patient . . . on or about March 26, 1986."

these hearings, the committee received written and oral evidence as to each of the executive committee's reasons for not recommending reappointment.

On October 1, 1986, during the Dinep committee's review of the plaintiff's nonreappointment, the hospital, through clerical error, notified the plaintiff that he had been appointed to the medical staff for the period July 1, 1986 through June 30, 1987.

In its October 15, 1986 report, the Dinep committee unanimously upheld the termination of the plaintiff's staff privileges. The plaintiff was thereafter advised that the executive committee had considered the Dinep committee's report and had voted to confirm its recommendation that he not be reappointed to the medical staff. He was given a copy of the Dinep report and advised of his right to appellate review of this executive committee decision, pursuant to the bylaws. The plaintiff then requested and was afforded appellate review by a committee of the hospital's board of directors, conducted by its chairman, Anthony A. Cooper (Cooper committee). He was also advised that the executive committee's recommendation would be considered by the hospital's joint conference committee and he was invited to appear before that committee. On December 5, 1986, the plaintiff was advised that the Cooper committee would begin its hearings on December 17, 1986, and that he could submit a written statement on his behalf. On January 8, 1987, Antoinette Capriglione, the executive committee's representative before the Cooper committee, supplied the plaintiff with the names of thirteen patients that he had requested at one of the hearing sessions. The plaintiff and his counsel attended all of the Cooper committee hearings, and the plaintiff was afforded the opportunity to present his position. The Cooper committee thereafter deliberated and unanimously recommended

that the board of directors uphold the executive committee's recommendation to terminate the plaintiff's staff privileges.

On February 19, 1987, the plaintiff was officially notified that the board of directors had voted to terminate his medical staff privileges.

Additional facts will be set forth in this opinion as necessary to resolve the plaintiff's claims.

I

The linchpin of the plaintiff's several claims is the hospital's alleged violation of its own medical staff bylaws in reaching its decision to terminate his staff privileges. The trial court properly found, and the parties do not dispute, that the medical staff bylaws of New Britain General Hospital constitute an enforceable part of the contract between the hospital and the plaintiff. "Because issues of contractual rights and duties are subject to judicial review, it follows that because the . . . medical staff bylaws are an integral part of the contractual relationship between the plaintiff and this hospital, actions under these bylaws are also subject to judicial review." *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 64, 557 A.2d 1249 (1989).

The parties disagree, however, as to the proper scope of judical review by the trial court of the hospital's compliance with the bylaw procedures in its determination not to reappoint the plaintiff to the medical staff. In its memorandum of decision, the trial court did not expressly articulate what standard of review it was applying. The trial court did implicitly recognize, however, that "[w]hether [a physician] is ultimately entitled to staff privileges is not for [the] court to decide. Hospital staffing decisions must be left to the expertise of

the staff and administration of the Hospital."[3] *Balkissoon* v. *Capitol Hill Hospital,* 558 A.2d 304, 310 (D.C. App. 1989). A trial court must not substitute its own judgment for that of the hospital; id.; and must be "hesitant to overturn a hospital's decision to dismiss or curtail a physician's privileges unless [the] plaintiff can show that the procedures followed violated the . . . bylaws of the hospital." *Pariser* v. *Christian Health Care Systems, Inc.,* 627 F. Sup. 39, 43 (E.D. Mo. 1984), modified, 816 F.2d 1248 (8th Cir. 1987).

There is no question that in reaching a decision to revoke a physician's staff privileges a hospital must comply with its own bylaws; *Gianetti* v. *Norwalk Hospital,* supra, 63; and that the trial court may not uphold a revocation implemented without compliance with the procedures specified in the bylaws. See *Pariser* v. *Christian Health Care Sysytems, Inc.,* supra, 816 F.2d 1251. The plaintiff contends that the trial court improperly applied a test of substantial compliance in determining whether, in the course of terminating his staff privileges, the hospital complied with its bylaw obligations to him. He contends that because his right to practice medicine involves a "fundamental" right, the proper test is one of strict compliance.[4] The defendant, on the other hand, argues that the trial court appropriately applied a substantial compliance standard and properly determined that no breach of the hospital bylaws occurred.

To determine the proper standard by which to measure the compliance of the hospital with procedures set forth in its own medical staff bylaws, we must look to the purpose that these bylaws are intended to serve.

[3] The court also stated several times during the trial that it did not perceive its role as retrying the merits of the hospital's decision not to reappoint the plaintiff.

[4] The plaintiff argues in the alternative that, even under a substantial compliance standard, the trial court's decision is incorrect.

The bylaws create a decision-making process that affords a physician certain protections and assures that the hospital does not impose restrictions on or revoke a physician's staff privileges on the basis of unsupported accusations or on an arbitrary, unreasonable or capricious basis. See *Balkissoon* v. *Capitol Hill Hospital,* supra, 307. In the present case, the protections afforded by the bylaws of the hospital with respect to a revocation of staff privileges include formal hearings before an ad hoc committee after the executive committee votes to recommend revocation, as well as review by both the hospital's joint conference committee and a committee of the hospital's board of directors; with respect to restrictions on staff privileges, the practitioner is afforded an informal preliminary investigation by an ad hoc committee appointed by the executive committee; informal discussions before the executive committee, at which the affected practitioner may present witnesses and rebuttal testimony; and thereafter an array of appellate review procedures similar to those available when staff privileges are revoked. "The purpose of such [procedures] is to provide, outside of the judicial system, a fair method for making decisions concerning staff privileges." *Nanavati* v. *Burdette Tomlin Memorial Hospital,* 107 N.J. 240, 251, 526 A.2d 697 (1987).

In our view, this purpose of providing procedural fairness is well served by requiring substantial compliance with the terms of the bylaws. See *Friedman* v. *Memorial Hospital of South Bend, Inc.,* 523 N.E.2d 252, (Ind. App. 1988); *Terre Haute Regional Hospital, Inc.* v. *El-Issa,* 470 N.E.2d 1371 (Ind. App. 1984). A hospital breaches its bylaw obligations when its actions in restricting or terminating a physician's staff privileges fail to comply with material bylaw provisions as to notice of charges, opportunity to respond, right to an impartial evidentiary hearing, and the other basic pro-

cedural protections set forth in the bylaws for fairly resolving these matters. This standard presupposes that irregularities in procedural compliance will not constitute a breach of the bylaws unless the physician can establish that the hospital has failed to cure these lapses adequately or timely or that these lapses have been wilfully made or have otherwise prejudiced the outcome of the process. Because the central purpose of the bylaws is to provide procedural fairness in reaching decisions regarding staff privileges, merely "technical" violations or minor deviations in the procedures employed that do not result in material prejudice to the physician or otherwise undermine the result reached by the hospital will not rise to the level of "breaches" of the hospital's obligation to comply with its bylaws.[5] The trial court must look at the proceeding as a whole to determine whether the requirements of the bylaws have been met or, on the other hand, the proceeding has been fatally flawed by procedural irregularities. A revocation of staff privileges, if made in substantial compliance with the essential provisions of the bylaws, should be set aside only if it is the result of bias or is arbitrary, capricious or unreasonable. See, e.g., *Widen* v. *Atlanta Hospital Sub Issue B, Inc.*, 194 Ga. App. 890, 392 S.E.2d 60 (1990); *Silver* v. *Queen's Hospital*, 63

---

[5] In *Gianetti* v. *Norwalk Hospital,* 211 Conn. 51, 66, 557 A.2d 1249 (1989), our Supreme Court compared the review process established by the medical staff bylaws of a hospital to an administrative procedure. The standard of review we adopt here is thus similar to that applied by a trial court when it reviews the action of an administrative agency. In the administrative context, "not all procedural irregularities require a reviewing court to set aside [a] decision; material prejudice to the complaining party must be shown." (Internal quotation marks omitted.) *Jutkowitz* v. *Department of Health Services,* 220 Conn. 86, 97, 596 A.2d 374 (1991); see General Statutes § 4-183 (j). An administrative proceeding is not "tainted" by procedural irregularities unless substantial rights of the parties have been prejudiced. See *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 491 A.2d 1058 (1985); *Lee* v. *Board of Education,* 181 Conn. 69, 434 A.2d 333 (1980).

Haw. 430, 629 P.2d 1116 (1981); *Carson* v. *Northwest Community Hospital*, 192 Ill. App. 3d 118, 548 N.E.2d 579 (1989); *Lapidot* v. *Memorial Medical Center*, 144 Ill. App. 3d 141, 494 N.E.2d 838 (1986); *Friedman* v. *Memorial Hospital of South Bend, Inc.*, supra.[6]

## II

Having concluded that the standard by which to measure the hospital's performance under its bylaws is one of substantial compliance, we turn to the merits of this appeal. Each of the many claims raised by the plaintiff presents a challenge to the factual findings and conclusions of the trial court with respect to the hospital's procedural compliance with the bylaws. We begin, therefore, by setting forth the standard for our review.

[6] In *Nanavati* v. *Burdette Tomlin Memorial Hospital*, 107 N.J. 240, 251–52, 526 A.2d 697 (1987), the court noted that courts in other states have employed an administrative type standard of review to cases involving staff privileges. "See, e.g., *Miller* v. *National Medical Hosp. of Montgomery Park, Inc.*, 124 Cal. App. 3d 81, 84, 177 Cal. Rptr. 119, 121 (1981) (hospital board's findings must be supported by 'substantial evidence in light of the whole record'); *Bricker* v. *Sceva*, 111 N.H. 276, 279, 281 A.2d 589, 592, cert. denied, 404 U.S. 995, 92 S. Ct. 535, 30 L. Ed. 2d 547 (1971) (hospital board must make an 'intelligent and reasonable judgment in good faith') . . . *Huffaker* v. *Bailey*, 273 Or. 273, 276, 540 P.2d 1398, 1401 (1975) (decisions of board are not overruled as long as made in 'good faith and supported by an adequate factual basis'); see also *Silver* v. *Castle Memorial Hosp.*, 53 Hawaii 475, 480, 497 P.2d 564, 568, cert. denied, 409 U.S. 1048, 93 S. Ct. 517, 34 L. Ed. 2d 500 (1972) (judicial review is available as to whether hospital board's decision has resulted in an arbitrary, capricious or unreasonable exclusion); *Kiracofe* v. *Reid Memorial Hosp.*, 461 N.E.2d 1134, 1140–41 (Ind. App. 1984) (hospital decision concerning staff privileges is accorded great deference and judicial review is limited to whether procedures employed are fair, standards set by hospital are fair, and standards are applied with arbitrariness or capriciousness); *Miller* v. *Indiana Hosp.*, 277 Pa. Super. 370, 375, 419 A.2d 1191, 1194 (1980) (rules of evidence need not be so stringently applied in hearing before hospital committee as they are in trial); Note, *Hospital Staff Privileges: The Need for Legislation*, 17 Stan. L. Rev. 900, 924 . . . ('it would seem desirable to limit the court to a "substantial evidence" rule')."

" '[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleading in the whole record, those facts are clearly erroneous.' *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). On appeal, we must give the evidence the most favorable construction in support of the judgment to which it is entitled. *Gorra Realty, Inc.* v. *Jetmore,* 200 Conn. 151, 160, 510 A.2d 440 (1986)." *Polverari* v. *Peatt,* 29 Conn. App. 191, 201, 614 A.2d 484, cert. denied, 224 Conn. 913, 617 A.2d 166 (1992).

"It is not our function to examine the record to see if the trier of fact could have reached a contrary conclusion. . . . [W]e are not permitted to reject a factual finding on appeal merely because we, as a reviewing court, might disagree with the conclusion or would have reached a different result had we been sitting as the factfinders." (Citation omitted; internal quotation marks omitted.) *Zarembski* v. *Warren,* 28 Conn. App. 1, 5, 609 A.2d 1039, cert. denied, 223 Conn. 918, 614 A.2d 831 (1992). "This court cannot find fact or draw conclusions from primary facts found, but can only review such findings to determine whether they could have legally, logically and reasonably been found by the trier." *Robertson* v. *Nationwide Mutual Ins. Co.,* 20 Conn. App. 635, 637, 569 A.2d 565 (1990).

## A

### NOTICE

The plaintiff claims that the trial court improperly determined that the hospital did not breach its contract with him by violating the notice provisions of the medical staff bylaws. This claim has two parts. First, the plaintiff argues that he was given insufficient notice of the charges that formed the basis of Strauch's

request for restrictions on his practice because Strauch "never specified the patients who allegedly received substandard care from Dr. Owens." Second, he argues that, at its June 9, 1986 meeting, the executive committee considered matters beyond the scope of the notice of charges that he had earlier received from Bray.

We find no basis in the bylaws for the plaintiff's contention that Strauch's request for corrective action violated his right to notice under the bylaws. Article VII governs the procedures that must be followed when corrective action is undertaken against a physician. Section 1 (a) of article VII provides in pertinent part that corrective action may be requested by the chief of any clinical department "[w]henever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be disruptive to the operations of the hospital . . . ." The plaintiff does not claim that Strauch, as chief of the department of surgery, was unauthorized to bring a request for corrective action. Section 1 (a) further provides that "[a]ll requests for corrective action shall be in writing, shall be made to the executive committee, and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request."

Under the explicit terms of this bylaw section, there is no duty on the part of the person initiating the request for corrective action or on the part of the executive committee to notify the affected practitioner that such action has been requested or of the grounds for the request. By their express terms, the bylaws do not provide for any notice to the affected physician until an ad hoc committee has been formed to investigate the request for corrective action. Section 1 (c) of article VII provides that the ad hoc committee's investigation "shall include an interview with the practitioner,

*at which time he shall be informed of the general nature of the charges. . . ."* (Emphasis added.) Because there is no basis in the bylaws for the plaintiff's contention that Strauch's recommendation for corrective action failed to provide *the plaintiff* with specific notice of the charges against him, there is likewise no basis for his claim that this alleged bylaw obligation was breached.

Even if the bylaws could be construed to require that the letter initiating corrective action constitute adequate notice to the practitioner, there is ample evidence to support the trial court's conclusion that Strauch's September 19, 1985 letter to the executive committee was filed "in accordance with the medical staff bylaws." The letter summarizes the background leading up to Strauch's recommendation, including the limitations and restrictions resulting from the Collins-Schlesinger review and the results of the Simon report. The evidence adduced at trial indicates that the plaintiff was well aware of the activities and conduct constituting the grounds for the recommended corrective action. Six months earlier, Strauch had presented him with a copy of the Simon report and had stated at that time his intent to pursue corrective action. The plaintiff then spent the ensuing six months preparing a case-by-case rebuttal of the Simon report. The plaintiff was also aware of the recommendations set forth in the Collins-Schlesinger report and had voluntarily accepted the restrictions enacted by Strauch, the alleged violation of which formed part of the basis for requesting corrective action. We will not reverse the trial court's determination because the record legally, logically and reasonably supports the court's conclusion that Strauch's September 19, 1985 notice to the executive committee conformed to the bylaws.

The plaintiff also rests the first prong of this claim of inadequate notice on his contention that no report written by any committee of the hospital during all

reviews directed at restrictions on his practice cited specific cases. Again, we find no support for this contention. In fact, the evidence supports the defendant's position that the plaintiff received the benefit of such notice.

The plaintiff specifically responded to the 157 cases cited in the Simon report that formed the basis of the recommendation for corrective action. When the Waskowitz committee prepared the report of its informal investigation into the charges raised by Strauch, it considered some thirty-five additional cases of the plaintiff, the names of which Strauch had supplied to the committee. While the plaintiff was not provided with the names of these cases until after the Waskowitz committee had completed its report, he was provided this information as well as a copy of the Waskowitz committee's report in advance of the November 15, 1985 meeting at which the executive committee considered that report, discussed the cases, and heard his rebuttal to the charges.

At the time the plaintiff exercised his right to a formal hearing on the executive committee's decision to impose restrictions, he had received copies of the information that had been considered by the executive committee. When his practice was being monitored for compliance with restrictions, the plaintiff was provided with the cases for which compliance was lacking. In the final stages of appellate review, when he requested a list of cases presented to the Cooper committee by Capriglione, the list was given to him in advance of the next scheduled meeting, thus giving him an opportunity to respond. During the course of the many hearings on the restrictions and reappointment matters, when cases were cited or discussed, the plaintiff was provided with names or case numbers. The trial court specifically found that the plaintiff had been given sufficient notice to allow him time to respond to this infor-

mation. From our own review of the evidence, we conclude that that finding is not clearly erroneous.

The second prong of the plaintiff's claim that he was deprived of adequate notice of the charges against him rests on his argument that the executive committee, at its June 9, 1986 meeting, considered matters that went beyond the scope of the notice sent to him by Bray regarding the charges that would be addressed during that meeting. Specifically, he contends that the executive committee's reliance on its finding of a pattern of disregard of hospital procedures, policies and patient rights as a basis for its recommendation not to reappoint him "went far outside of the notice of the charges which were to be considered" at the June 9 meeting. We disagree.

The trial court specifically found that the June 9, 1986 meeting of the executive committee was not a proceeding under article VII of the bylaws, which addresses corrective action, but was instead a proceeding under article V, which delineates procedures for reappointment to the medical staff. The plaintiff does not dispute that if the June 9, 1986 meeting was an article V proceeding, the bylaws did not require the executive committee to provide him with *any* prior notice regarding the nature of the discussions that would take place at the meeting. He argues, instead, that the trial court's finding that the June 9 meeting was an article V proceeding is clearly erroneous.

To support this contention, the plaintiff points to Bray's May 1986 letters to him regarding the upcoming June 9 meeting, which stated that, in connection with charges by Nourizadeh that he had harassed a patient and operated on another physician's patient, the executive committee was "disposed to take firm corrective action." The content of these letters, he claims, can only be interpreted as indication that the

executive committee viewed the June 9 meeting as a proceeding under article VII, which authorizes corrective action. He further contends that the special June 9 meeting could not have been an article V proceeding, since the executive committee had already voted at its regular meeting on June 6, 1986, to reappoint him to the medical staff.

Article V, section 3 (a), of the bylaws provides that "[p]rior to the final scheduled governing body meeting in the medical staff year, the staff executive committee shall complete its review of all pertinent information available on each practitioner scheduled for periodic appraisal for the purpose of determining its recommendations for reappointments to the medical staff, and for the delineations and granting of clinical privileges for the ensuing period." Section 3 (c) of article V provides that the executive committee "shall make written recommendations to the governing body . . . concerning the reappointment or nonappointment of each member of the medical staff, including the specific privileges to be granted to each reappointee for the ensuing period. Where nonreappointment or reduction in clinical privileges is recommended, the reasons for such a recommendation shall be stated." There is no limitation in article V as to the type of information that the executive committee may consider in making this recommendation.

These sections of the bylaws indicate that a recommendation with respect to reappointment could entail a "reduction in clinical privileges" just as could a decision on a recommendation for corrective action. Although Bray's May 16, 1986 letter suggests that the executive committee could have considered corrective action pursuant to article VII following its inquiry into the charges by Nourizadeh, there is no suggestion that this matter would not be considered by the executive committee in its recommendation on reappointment.

Although the executive committee voted on June 6, 1986, to recommend that the plaintiff be reappointed to the medical staff, there is no evidence that a "written recommendation" had actually been given to the board of directors. There is also nothing in the bylaws that prohibits the executive committee from reconsidering and superseding an earlier vote on reappointment prior to the executive committee's actually bringing that recommendation to the board. The evidence reveals that this is exactly what occurred.[7]

We conclude that the evidence adequately supports the trial court's conclusion that the June 9 meeting was "nothing more than an additional proceeding under article V, that is a nonreappointment recommendation." Because this meeting was an article V proceeding, there is no basis for the plaintiff's claim that he did not have adequate "notice" of the charges that were considered by the executive committee in its vote to not reappoint him to the medical staff.

## B

### OPPORTUNITY TO RESPOND

The plaintiff claims that the trial court improperly determined that the hospital did not breach its obligation under the bylaws to provide him with an adequate opportunity to respond to the charges against him. This claim encompasses three alleged violations of the bylaws on the part of the hospital: (1) use of the Collins-

---

[7] The evidence indicates that after meeting with the plaintiff and discussing the charges stemming from Nourizadeh's complaint, the executive committee passed the following motion: " 'In consideration of Dr. Owens' past performance, his many reviews and ad hoc committee reports, evidence of unethical behavior based on article V, section 3, paragraph 2B of the [New Britain General Hospital] bylaws, and after three hours of deliberation, the [staff executive committee] recommends denial of reappointment to the medical staff for Guy Owens, M.D. (This supersedes action taken at the 6/6/86 meeting.)' "

Schlesinger report; (2) denial of access to records; and (3) denial of an opportunity to present evidence of compliance with restrictions imposed by the executive committee.

The plaintiff first takes issue with the trial court's conclusion that the hospital did not violate his right to an opportunity to respond to the charges against him when it used the Collins-Schlesinger report as the basis for its decision not to reappoint him to the medical staff. He argues that the trial court's finding, stated in its June 10, 1992 articulation, that he had ample opportunity to present his defense of the cases listed in the Collins-Schlesinger report is completely devoid of evidentiary support because he had no way of knowing which cases were reviewed or how they were selected.[8]

We agree with the plaintiff's contention inasmuch as he states that the trial court improperly found that he was able to present his defense of the cases mentioned in the Collins-Schlesinger report because the evidence clearly demonstrates that there were no cases specifically identified in that three page report and the identities of the sixty patients reviewed by Collins and Schlesinger were never revealed to the plaintiff. "Where, however, some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence

---

[8] The court stated that it found "that in each and every instance when a case mentioned in the Collins-Schlesinger report was used by the various hospital committees hearing the issue on the nonreappointment of Dr. Owens, Dr. Owens and his able counsel were timely put on notice of the specifics into which the committee was inquiring, and the court further finds that the plaintiff appellant was well able to respond fairly and adequately reply to all such issues."

in the court's fact finding process, a new hearing is required." (Citation omitted; internal quotation marks omitted.) *DiNapoli* v. *Doudera,* 28 Conn. App. 108, 112, 609 A.2d 1061 (1992). We conclude that the trial court's finding as to the plaintiff's ability to respond to the cases listed in the Collins-Schlesinger report was harmless error and does not undermine the court's conclusion that he was able to respond adequately to the findings and recommendations of that report.

By the time Strauch made his request for corrective action, the significance of the Collins-Schlesinger report was not in the particular cases that Collins and Schlesinger had reviewed to arrive at their conclusions. Rather, the significance was that certain restrictions had been imposed on the plaintiff's practice as a result of the Collins-Schlesinger review, that the plaintiff had initially agreed to abide by those restrictions, and that the plaintiff was now violating the restrictions. Each of the various committees that later considered the Collins-Schlesinger report also focused not on the underlying cases that formed the basis of the report, but instead on the conclusions of the report. Even more important, however, were the restrictions enacted pursuant to the report, and the plaintiff's continued disregard of the restrictions. Our review of the evidence convinces us that the trial court properly determined that the plaintiff had ample opportunity to respond to the issues raised by these committees as to the Collins-Schlesinger report. We conclude that the plaintiff has seized on an erroneous finding of the trial court that is harmless in light of the court's overall finding, which was not clearly erroneous.

The plaintiff also contends that the Collins-Schlesinger review was not authorized by the bylaws and that Strauch did not have the authority to impose restrictions on his practice after that report was made. He further contends that he had the right not to con-

tinue abiding by those restrictions when the hospital failed to hold the monthly reviews instituted by Strauch.

We need not decide at this point whether the trial court improperly concluded that the Collins-Schlesinger report and the recommendations and restrictions resulting from it were authorized by the bylaws. On February 1, 1983, the plaintiff voluntarily agreed in writing to comply with those restrictions on his practice.[9] At that time, he did not challenge either Strauch's authority to authorize a review of the neurosurgical section or the results of the review, and did not seek the identities of the patients whose charts formed the basis of the conclusions in the report. He instead "signed on" to the review process initiated by Strauch. Under the circumstances, we must conclude that the plaintiff waived his right as to any breach resulting from Strauch's implementation of the recommendations made in this report. See *Lanna* v. *Greene,* 175 Conn. 453, 458, 399 A.2d 837 (1978) (general rule is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision). Moreover, as we pointed out earlier, it was the plaintiff's violation of these restrictions, to which he had previously agreed—not his handling of the sixty cases reviewed by Collins and Schlesinger—that formed part of the basis of Strauch's subsequent recommendation for corrective action and the resulting actions by the executive committee.

The second part of this claim of inadequate opportunity to respond relates to the hospital's refusal to release to the plaintiff his box of documents so that he

---

[9] One of the numerous exhibits admitted into evidence at trial was a copy of Strauch's letter outlining his intent to initiate a review pursuant to the Collins-Schlesinger report and containing the plaintiff's handwritten notation, "OK with me. Guy Owens."

could prepare for an interview before the Waskowitz committee. The plaintiff claims that as a result of this refusal, he was deprived of a fair opportunity to present any defense before the executive committee imposed the October 29, 1985 restrictions on his practice. We find this claim to be overstated.

The trial court specifically found that with respect to the return of the box of documents, "the hospital behaved other than it was required to behave under the bylaw requirements." The court also found, however, that this erroneous behavior was rectified in time for the plaintiff to make effective use of the material in the formal hearings in his case. We agree.

As we noted previously, the role of the Waskowitz committee, as authorized by article VII of the bylaws, was to conduct an informal, preliminary investigation into the recommendation for corrective action. Even the executive committee's decision to proceed with the request for corrective action was preliminary, in that the decision preceded a series of formal, evidentiary hearings into the matter by the Devers committee.

While it is unfortunate that the Waskowitz committee was not able to interview the plaintiff prior to submitting its report, neither that committee nor the executive committee deprived the plaintiff of a meaningful opportunity to respond in this matter. Further, the box of materials, with which the plaintiff must have been quite familiar in view of his having recently prepared a detailed case-by-case response for Strauch, was returned to him on November 1, 1985. The trial court specifically found that this gave the plaintiff sufficient time to prepare for the executive committee proceedings that began on November 15, 1985. The plaintiff also had these materials available to him throughout the formal hearings before the Devers committee. While we do not sanction the hospital's with-

holding of the box, we simply cannot conclude that this procedural irregularity undermined the entire hearing process. We must agree with the trial court's conclusion that this action was adequately cured and resulted in no material prejudice to the plaintiff.

The final part of this claim of an inadequate opportunity to respond relates to the refusal of the Cooper appellate review committee, whose charge it was to review the executive committee's decision recommending that the plaintiff not be reappointed to the medical staff, to hear evidence that the plaintiff was in compliance with the restrictions enacted on October 29, 1985. We find this contention to be without merit.

Article VIII of the medical staff bylaws affords a practitioner the right to an appellate review by the hospital's board of directors after the executive committee has affirmed a decision to recommend nonreappointment to the board. Section 6 (f) of the "Protocol For Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4, provides that "[t]he review shall be for the purpose of determining whether the adverse recommendation or action which is the subject of the review was justified on the facts considered and was not arbitrary, unreasonable, or capricious"; § 6 (g) states that "[n]ew or additional matters not raised or presented during the original hearing or in the hearing committee and not otherwise reflected in the record of proceedings shall not be introduced at the appellate review except in the discretion of the appellate review body under unusual circumstances justifying such introduction."

The report of the Cooper committee directly addressed the committee's decision not to consider evidence of the plaintiff's compliance with the November 21, 1985 restrictions on his practice, which he had accepted after the executive committee's June 9, 1986

decision not to recommend reappointment. The report stated: "Dr. Owens requested that Dr. Bray describe events relating to supervision of Dr. Owens' practice since the Staff Executive Committee decision of June 9, 1986. The Committee determined that its purpose was to review the June 9th decision and matters leading up to it not to investigate subsequent events. The Committee, however, did hear Dr. Bray state that Dr. Owens was complying with restrictions accepted by him during the summer of 1986."

The bylaws clearly give the appellate review committee the discretionary power to receive evidence that was not before the executive committee at the time of its decision. In this case, however, although the Cooper committee chose to exercise this discretion by hearing evidence of the plaintiff's compliance after June 9, 1986, it did not rely on that evidence as a basis for its decision to affirm or reject the executive committee's decision. Our review of the record reveals no procedural violation of the bylaws by the Cooper committee's actions. The trial court stated that "[a]fter an exhaustive review of the transcript of each and every proceeding conducted by the various hospital committees . . . the court finds that there has been no breach of contract by the defendant . . . ." We, too, have conducted an exhaustive review of the evidence and must agree with the trial court's well supported and reasonable conclusion that the plaintiff "was afforded all of the rights to which he was entitled under his contract with the defendant hospital."

### III

The plaintiff's final claim is that the trial court should have concluded that the cumulative effect of the hospital's several deviations from the bylaw requirements amounted to a breach of its contractual obligation to provide him with fair procedures. This claim

merely reiterates all of the issues raised in the two previous claims, which we have addressed fully, including the plaintiff's contentions that he could not adequately respond to the Collins-Schlesinger and Simon reports, that he was denied access to his only compilation of records to refute the Simon report, that the Waskowitz committee failed to notify him of the additional thirty-five cases it considered when preparing its report, and that he had no prior notice of the charges that formed the basis of the executive committee's decision to recommend that he not be reappointed to the medical staff. A conclusion that these actions *cumulatively* constituted a deprivation of "fundamental fairness" presupposes a finding that the hospital failed to provide the plaintiff with notice of specific charges of misconduct and an opportunity to respond to the charges. Because we have concluded that the trial court properly determined that the hospital had substantially complied with its bylaw obligations to provide the plaintiff with adequate notice of the charges against him and adequate opportunity to respond, and that no breach of the bylaws occurred, we need not address this catchall claim.

The judgment is affirmed.

In this opinion the other judges concurred.