Robert C. EGAN, M.D., Appellant,

v.

ST. ANTHONY'S MEDICAL CENTER, Respondent.

No. ED 92207.

Missouri Court of Appeals, Eastern District, Division One.

June 9, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 3, 2009.

Application for Transfer Denied Oct. 6, 2009.

Constitution and in statutes; it cannot be extended by a regulation.

Alan G. Kimbrell, Ballwin, MO, for appellant.

Neal F. Perryman, St. Louis, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Dr. Robert C. Egan appeals from the judgment of the Circuit Court of St. Louis County denying his request for injunctive relief against St. Anthony's Medical Center. Following St. Anthony's decision to permanently suspend his medical staff privileges, Dr. Egan filed suit to obtain an order requiring St. Anthony's to hold a new hearing regarding the suspension of his privileges, and to recall mandatory reports St. Anthony's submitted to the Missouri State Board for the Healing Arts and the National Data Bank regarding the revocation of his privileges. The trial court denied Dr. Egan's requested relief after determining that "St. Anthony's substantially complied with its own Bylaws before Dr. Egan's privileges were permanently revoked." On appeal, Dr. Egan raises six points, all of which challenge the trial court's conclusion that St. Anthony's "substantially complied" with its Bylaws. We affirm.

### Background and Procedural History

Dr. Egan has been a Board-certified general and vascular surgeon in Missouri for the past forty-two years. Prior to 2005, Dr. Egan was a member of the medical staff at St. Anthony's Medical Center for over twenty years where he performed an average of two hundred surgical procedures per year.

Like every physician on the medical staff at St. Anthony's, Dr. Egan was subject to continuous peer review. During 2003, a review committee identified a pattern of clinical occurrences by Dr. Egan which it considered to "fail to meet community standards of medical care." Subsequently, several internal committees conducted a comprehensive review of Dr. Egan's clinical practice at St. Anthony's, and, thereafter, submitted their reports to the Medical Executive Committee (MEC). Under St. Anthony's Bylaws,[1] the MEC is charged with the duty of "receiv[ing] reports from the standing and special committees and tak[ing] appropriate action upon them." In the fall of 2004, after reviewing the reports regarding Dr. Egan, the MEC imposed a "corrective action plan" which required that Dr. Egan permit concurrent proctoring of all cases and complete a behavioral health evaluation. Following the imposition of the corrective action plan, Dr. Egan's proctor prepared a report regarding Dr. Egan's questionable judgment during a surgery performed on June 13, 2005. Additionally, Dr. Egan's behavioral health evaluation, which was performed by Dr. Michael V. Oliveri, indicated findings of early, abnormal mental decline. After receiving these negative reports, on June 22, 2005, the President of the Medical Staff, the Surgery Department Director, and the CEO of St. Anthony's concurred in a decision to summarily suspend Dr. Egan's medical staff privileges.

### A. Notice

Pursuant to the Bylaws, which require "prompt written notice" of an "adverse recommendation or action", on June 22, 2005, the President of St. Anthony's Medical Staff hand-delivered a letter to Dr. Egan notifying him that his medical staff privileges had been "summarily suspend-

---

1. The term "Bylaws", as used in this opinion, refers to the "Amended and Restated Bylaws of the Medical, Dental, and Podiatric Staff of St. Anthony's Medical Center."

ed" in order to "avoid imminent threats" to St. Anthony's patients.[2] The letter explained that the "summary suspension [was] necessitated by the report of Michael V. Oliveri, Ph.D., ABPP, who found 'mild, relatively nonspecific neurocognitive abnormality classified as suggestive of early abnormal decline'" and because, on June 13, 2005, Dr. Egan "performed a right colectomy on an 81–year old female patient" without first consulting the patient's gastroenterologist who later indicated that surgery was not necessary.

Enclosed with the letter was a "Summary of Hearing Rights" informing Dr. Egan that under the Bylaws he was entitled to request a hearing and, upon such a request, would receive written notice "[d]etailing the reasons for the Adverse Action, including the acts or omissions with which [he was] charged." On July 18, 2005, Dr. Egan submitted a written request for a hearing and, in it, asked that he be further advised of the "acts or omissions" with which he was charged. Subsequently, on July 26, 2005, St. Anthony's sent Dr. Egan further written notice that reiterated Dr. Oliveri's behavioral health evaluation and the unnecessary colectomy Dr. Egan performed on June 13, 2005. Additionally, the notice stated that "[a]t the hearing, the Medical Executive Committee designees will present evidence on the cases described in Exhibit 1." Exhibit 1, which was attached to the notice, listed ten of Dr. Egan's cases and described the patients' general information, procedures performed, dates of treatment, comments, and the relevant concerns with Dr. Egan's performance in each case.

### B. The Hearing

On September 12, October 24, and December 12, 2005, Dr. Egan and the MEC, both represented by counsel, appeared before a Hearing Committee and presented evidence, including sworn testimony and exhibits. Specifically, the MEC, which under the Bylaws had the initial burden of justifying the summary suspension of Dr. Egan's staff privileges, introduced evidence regarding six of the ten cases listed in the July 26, 2005 notice. Next, Dr. Egan presented evidence defending his professional judgment in the cases raised by the MEC, as well as medical evidence rebutting Dr. Oliveri's report regarding his "abnormal mental decline." After the hearing closed, both the MEC and Dr. Egan submitted written statements and recommendations to the Hearing Committee.

Thereafter, on January 31, 2006, the Hearing Committee issued its findings and recommendation that St. Anthony's permanently suspend Dr. Egan's staff privileges. The Hearing Committee rendered no findings regarding the MEC's claim of Dr. Egan's abnormal mental decline. Rather, the Hearing Committee based its recommendation solely on two of the six cases presented by the MEC at the hearing.

The first case, as described in the Hearing Committee's findings, involved Dr. Egan performing a diverting colostomy on D.P. Specifically, the findings stated that Dr. Egan had "diverted the wrong limb of the bowel to the surface, resulting in a complete colonic obstruction." After realizing his mistake, Dr. Egan performed a second surgery on D.P. which "revised the colostomy." While the Hearing Committee acknowledged that "diverting the wrong limb of the bowel to the surface is a rare, but known mistake", the Committee faulted Dr. Egan for "fail[ing] to accurate-

---

**2.** Under the Bylaws, "[s]ummary suspension of privileges is a drastic action ... [and][t]he Medical Center must be able to justify summary action on the basis that life or health is imminently threatened."

ly document what actually occurred during the first surgery anywhere in the patient's medical record (specifically, his operative report), and fail[ing] to inform the patient or her family of his mistake." The findings further stated that "[Dr. Egan's] failure to disclose the mistake to the patient and her family or to acknowledge that disclosure was required does not comport with the standard of care at this hospital, and subjected the other members of the treatment team to increased liability" * * * "In [the case with D.P.], Dr. Egan violated the law and/or principles of medical ethics".

The second case involved the June 13, 2005 surgery described in the first notice given to Dr. Egan where he had performed an unnecessary colectomy on 81–year–old H.S. In its findings, the Hearing Committee described how Dr. Egan performed the colectomy to remove a tumor without first consulting with H.S.'s gastroenterologist, Dr. Bhat, who had already successfully removed the tumor two months earlier. The Hearing Committee concluded that "there were no indications for the colectomy performed on [H.S.]" and "[t]here [was] no justification for Dr. Egan's failure to consult with Dr. Bhat" prior to performing the colectomy. The Hearing Committee further opined that Dr. Egan's "attempt to place the blame for his mistake on the patient or her other physician is unprofessional and unacceptable; demonstrating to the Hearing Committee that Dr. Egan has not accepted full responsibility for his actions and therefore is likely to repeat his mistakes."

### C. Appeal

Following the Hearing Committee's decision, Dr. Egan timely requested appellate review. Under the Bylaws, an "affect-

ed practitioner" may seek review by a six-member Appellate Review Committee comprised of three members of St. Anthony's Board of Directors and three Medical Staff members selected by the affected practitioner. The Appellate Review Committee may review the record made at the previous hearing, the Hearing Committee's report, and written statements submitted by the MEC and the affected practitioner. The Appellate Review Committee, however, may not accept new oral or written evidence unless "such evidence could not have been made available to the Hearing Committee in the exercise of due diligence[.]" Additionally, the affected practitioner and MEC members are not permitted to be present during the Appellate Review Committee's review and deliberations.

In accordance with the above mentioned Bylaws, an Appellate Review Committee was formed and reviewed the Hearing Committee's findings and recommendation. During the Appellate Review Committee's deliberations, three directors and two physicians selected by Dr. Egan were in attendance.[3] Following its review, the Appellate Review Committee voted 4–to–1 to affirm the Hearing Committee's recommendation to permanently suspend Dr. Egan's staff privileges. The sole dissenter, Dr. Bruce Schlafly, submitted a written statement to St. Anthony's Board of Directors recommending that Dr. Egan's privileges be restored. In his statement, Dr. Schlafly claimed that a second appellate review of the Hearing Committee's recommendation was necessary because one of the Appellate Review Committee members, Dr. Kirk Nelson, "introduced his

---

**3.** The Bylaws require that "[a]t least two (2) members from the Board of Directors and two (2) members from the panel chosen by the Affected Practitioner ... must be present throughout the review and deliberations."

own oral testimony regarding Dr. Egan's professional conduct[.]"

On May 30, 2006, St. Anthony's Board of Directors reviewed the Appellate Review Committee's report and recommendation together with Dr. Schlafly's written statement. The Board accepted the recommendation of the Appellate Review Committee and unanimously voted to revoke Dr. Egan's staff privileges. As required by state and federal law, St. Anthony's reported the revocation of Dr. Egan's privileges to the Missouri Board of Registration for the Healing Arts ("Board of Healing Arts") and the National Practitioners Data Bank ("Data Bank").[4]

### D. Lawsuit

On July 25, 2006, Dr. Egan filed a multi-count petition against St. Anthony's in the Circuit Court of St. Louis County alleging that St. Anthony's failed to comply with its Bylaws before permanently suspending his staff privileges. As relief, Dr. Egan requested that the trial court order St. Anthony's to conduct a new hearing in compliance with the Bylaws, and to withdraw the reports it submitted to the Board of Healing Arts and the Data Bank. In response, St. Anthony's moved to dismiss contending that Dr. Egan's lawsuit was precluded by the rule of non-review set forth in *Cowan v. Gibson*, 392 S.W.2d 307 (Mo.1965), which held that a private hospital's decision regarding its staff is not subject to judicial review. Relying on *Cowan*, the trial court dismissed the petition, and this court affirmed. *Egan v. St. Anthony's Med. Ctr.*, 2007 WL 738674 (Mo.App. E.D. Mar.13, 2007).

On transfer, the Missouri Supreme Court reversed and announced a new standard for limited judicial review of medical staffing decisions. *Egan v. St. Anthony's Med. Ctr.*, 244 S.W.3d 169 (Mo. banc 2008)

(*Egan I*). Specifically, the Court held for the first time that an aggrieved member of a medical staff, such as Dr. Egan, "may bring an action in equity for injunctive relief to compel the hospital to substantially comply with its own bylaws before his privileges may be revoked." *Id.* at 174. The Court remanded the case for the trial court to determine whether St. Anthony's substantially complied with its Bylaws. *Id.*

On remand, the trial court heard testimony from Dr. Egan, and accepted into evidence stipulated exhibits pertaining to St. Anthony's revocation of Dr. Egan's staff privileges. Thereafter, the trial court issued its judgment denying Dr. Egan's requested injunctive relief. In its judgment, the trial court concluded that "St. Anthony's substantially complied with its own Bylaws before Dr. Egan's privileges were permanently revoked" and "there was substantive procedural fairness at every step in the process." This appeal follows.

### Standard of Review

In court-tried cases, the trial court's judgment must be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In a case tried on stipulated facts, however, the only issue on appeal is whether the trial court drew the correct legal conclusion from the stipulated facts. *Duckett Creek Sewer Dist. of St. Charles County v. Golden Triangle Dev. Corp.*, 32 S.W.3d 178, 181 (Mo.App. E.D. 2000).

### Discussion

Dr. Egan contends that the trial court erred in concluding that St. Anthony's sub-

---

**4.** *See* 42 U.S.C. § 11101 *et seq.* (2000); Mo. Rev.Stat. § 383.133 (2000).

stantially complied with its Bylaws prior to permanently revoking his staff privileges because: (1) a member of the Appellate Review Committee, Dr. Nelson, introduced "oral evidence" regarding matters outside the evidence presented before the Hearing Committee; (2) two members of the Appellate Review Committee were biased against Dr. Egan, thereby depriving him of "procedural fairness"; (3) St. Anthony's written notice of charged "acts or omissions" failed to notify Dr. Egan that he was charged with failing to inform D.P. or her husband that her colostomy had to be revised because he brought the wrong limb of the bowel to the surface during the first surgery; (4) the Board of Directors based its decision on recommendations and reports from committees other than the Hearing Committee and the Appellate Review Committee; (5) the Hearing Committee received *ex parte* reports of Dr. Egan's surgical procedures; and (6) the MEC, the Hearing Committee, and the Appellate Review Committee improperly used an argument of Dr. Egan's counsel from his post-hearing memorandum as evidence that Dr. Egan had "not accepted responsibility for his actions" in the second case involving H.S.

### A. "Substantial Compliance" with Hospital Bylaws

Before addressing the merits, we first resolve the parties' dispute over the proper standard for determining whether a hospital "substantially complied" with its bylaws. While Dr. Egan's and St. Anthony's proposed standards draw from a diverse body of case law from various jurisdictions that have articulated standards for judicial review of hospital staffing decisions, to define what "substantial compliance" means in Missouri, we begin with the guidance provided by our Supreme Court in *Egan I.*

In *Egan I,* the Court determined that a "limited departure" from the rule of non-review was necessitated by certain legal developments following the Court's 1965 decision in *Cowan.* 244 S.W.3d at 172–73. Particularly, the Court first noted that since *Cowan,* "forty-six states and the District of Columbia have adopted a limited exception of one kind or another to the general rule of non-review of the staffing decisions of private hospitals." *Id.* at 172. Additionally, the Court examined the State Board of Health's 1982 promulgation of 19 CSR 30–20.021(2)(C)1–5 requiring all Missouri hospitals to adopt bylaws governing the professional activity of their medical staff and that those "[b]ylaws ... shall provide for hearing and appeal procedures for the denial of reappointment and for the denial, revocation, curtailment, suspension, revocation, or other modification of clinical privileges of a member of the medical staff." *Id.* at 173 (quoting 19 CSR 30–20.021(2)(C)(5) (presently codified at 19 CSR 30–20.086(5))) (emphasis omitted). The Court determined that "it is implicit under this regulation that hospitals not only have a legal duty to adopt bylaws, but also a corresponding duty to abide by those bylaws." *Id.* The Court added that the duly promulgated regulation constitutes "an expression of the public policy of this state." *Id.* That policy, as described by the Court, is intended to protect both patients and doctors, and "'attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action....'" *Id.* (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1322 (11th Cir.1994)).

After considering these legal developments, the Court concluded that "[g]iven the clear public policy from the regulation, and consistent with the overwhelming weight of authority, this Court holds that Dr. Egan, as an aggrieved member of the

medical staff, may bring an action in equity for injunctive relief to compel the hospital to substantially comply with its own bylaws before his privileges may be revoked." *Id.* at 174. Clarifying its holding, the Court further stated that a hospital's obligation to act in accordance with its bylaws is not contractual and will not provide an action for damages. *Id.* Likewise, the Court emphasized that "the purpose of [19 CSR 30–20.021(2)(C)1–5] is to implement a system of medical staff peer review, rather than judicial oversight, and it is clear that final authority to make staffing decisions is securely vested in the hospital's governing body with advice from the medical staff." *Id.* Given this purpose, the Court declared that it would "not impose judicial review on the merits of a hospital's staffing decisions, but will act only to ensure substantial compliance with the hospital's bylaws." *Id.*

■ With these principles in mind, we determine the proper standard for evaluating whether a hospital "substantially complied" with its bylaws. First, to demonstrate that a hospital failed to meet its legal duty to abide by its own bylaws, an adversely affected medical staff member must initially show that the hospital actually violated an express requirement of the bylaws. An identified violation of the bylaws, however, does not end the inquiry because, given the plain language from *Egan I*, the test is one of substantial compliance, not strict compliance. *See also Owens v. New Britain Gen. Hosp.*, 32 Conn.App. 56, 627 A.2d 1373, 1379–80 (1993) (*aff'd.*, 229 Conn. 592, 643 A.2d 233, 240 (1994)); *Stiller v. La Porte Hosp., Inc.*, 570 N.E.2d 99, 103 (Ind.Ct.App.1991). Therefore, upon finding a hospital's violation of its bylaws, the next question becomes whether the violation fell below the standard of "substantial compliance."

To answer this question, we consider the policy behind requiring medical staff bylaws. In *Egan I*, our Supreme Court stated that Missouri's public policy as expressed by 19 CSR 30–20.021(2)(C)1–5 is " 'to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action.' " 244 S.W.3d at 173 (quotation omitted). Reaching a similar conclusion, the Connecticut Appellate Court in *Owens v. New Britain General Hospital* reasoned that "[t]he purpose of such [hospital bylaws] is to provide, outside of the judicial system, a fair method for making decisions concerning staff privileges." 627 A.2d at 1380 (quoting *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 107 N.J. 240, 526 A.2d 697 (1987)) (internal alterations added). Guided by this purpose, the *Owens* court went on to define the contours of the "substantial compliance" test as follows:

A hospital breaches its bylaw obligations when its actions in restricting or terminating a physician's staff privileges fail to comply with material bylaw provisions as to notice of charges, opportunity to respond, right to an impartial evidentiary hearing, and the other basic procedural protections set forth in the bylaws for fairly resolving these matters. This standard presupposes that irregularities in procedural compliance will not constitute a breach of the bylaws unless the physician can establish that the hospital has failed to cure these lapses adequately or timely or that these lapses have been wilfully (sic) made or have otherwise prejudiced the outcome of the process. Because the central purpose of the bylaws is to provide procedural fairness in reaching decisions regarding staff privileges, merely "technical" violations or minor deviations in the procedures employed that do not result in material prejudice to the physician or

otherwise undermine the result reached by the hospital will not rise to the level of "breaches" of the hospital's obligation to comply with its bylaws. The trial court must look at the proceeding as a whole to determine whether the requirements of the bylaws have been met or, on the other hand, the proceeding has been fatally flawed by procedural irregularities.

*Owens,* 627 A.2d at 1380.

■ We find the above quoted language from *Owens* instructive. More specifically, we agree that the test for substantial compliance focuses on the hospital's adherence to those bylaws that set forth basic procedural protections, such as notice, hearing, and appeal procedures.[5] Conversely, a hospital's "technical" violations or minor irregularities in procedural compliance will generally not constitute a failure of substantial compliance. In addition, because a hospital's bylaws are not contractual but rather are intended to advance the public policy of protecting physicians improperly subjected to disciplinary action, violations of hospital bylaws that, when looking at the proceedings as a whole, "do not result in material prejudice to the physician or otherwise undermine the result reached by the hospital" do not fall below the standard of substantial compliance or warrant equitable relief. *Id.* Accord *Smith v. Our Lady of the Lake Hosp., Inc.,* 639 So.2d 730, 756 (La.1994) (quoting *Owens,* 627 A.2d at 1380); *Brinton v. IHC Hosp's., Inc.,* 973 P.2d 956, 971–972 (Utah 1998).

■ Finally, we reemphasize the Supreme Court's declaration in *Egan I* that it would "not impose judicial review on the merits of a hospital's staffing decisions...." 244 S.W.3d at 174. This limited form of judicial review is in harmony with courts from other jurisdictions that have expressed a reluctance to substitute their judgment for the superior professional judgment of hospital officials in evaluating hospital staff decisions. *See Univ. Health Serv's., Inc. v. Long,* 274 Ga. 829, 561 S.E.2d 77, 78 (2002) ("a court's role is not to substitute its judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.") (quotation, quotation marks, and internal alterations omitted); *see also Miller v. St. Alphonsus Reg'l Med. Ctr., Inc.,* 139 Idaho 825, 87 P.3d 934, 947 (2004); *Adkins v. Sarah Bush Lincoln Health Ctr.,* 129 Ill.2d 497, 136 Ill.Dec. 47, 544 N.E.2d 733, 738 (1989); *Mahmoodian v. United Hosp. Ctr., Inc.,* 185 W.Va. 59, 404 S.E.2d 750, 756 (1991). Consistent with this rationale, we agree that if a hospital substantially complies with its bylaws, the adversely affected medical staff member is not entitled to equitable relief and a reviewing court may not reweigh the evidence or interfere with the hospital's decision on the merits.

### B. Points on Appeal

#### 1. Committee Member's "Oral Evidence"

■ In his first point, Dr. Egan contends that the trial court erred in finding that St. Anthony's substantially complied with its Bylaws because a member of the Appellate Review Committee, Dr. Nelson, introduced "oral evidence" during the Appellate Review Committee's deliberations indicating that Dr. Egan had been reprimanded and had his privileges suspended

---

**5.** *See* 19 CSR 30–20.086(5) ("[b]ylaws ... shall provide *for hearing and appeal procedures* for the denial of reappointment and for the denial, revocation, curtailment, suspension, revocation, or other modification of clinical privileges of a member of the medical staff.") (emphasis added).

at other hospitals. The substance of Dr. Nelson's "evidence" is contained in Dr. Schlafly's written statement submitted to the Board of Directors, which provided in pertinent part:

"At the meeting, Dr. Nelson introduced his own oral testimony regarding Dr. Egan's professional conduct. (Dr. Nelson's oral testimony was not given under oath.) Although I do not have a verbatim transcript of Dr. Nelson's testimony, it was extremely critical of Dr. Egan's professional competence, based upon what Dr. Nelson has heard in the past at other hospitals, ... Dr. Nelson asserted that Dr. Egan has had privileges suspended at other hospitals, ... Dr. Nelson asserted that Dr. Egan has received multiple letters of reprimand over the years from various committees at various hospitals, ..."

(internal parenthetical in the original).

As an initial matter, the parties disagree as to whether Dr. Nelson's statements actually violated the terms of the Bylaws. Under Article X § 6:A of the Bylaws, the Appellate Review Committee is generally prohibited from accepting "oral evidence or written evidence". Dr. Egan argues that Dr. Nelson's statements were assertions of fact, and, by definition, constituted impermissible "oral evidence." Conversely, St. Anthony's contends that Dr. Nelson's statements were not "oral testimony", but were rather extraneous "comments" at most.

Without deciding this dispute over semantics, we agree with St. Anthony's alternative argument that even if Dr. Nelson's statements constituted impermissible "oral evidence", the statements did not result in prejudice to Dr. Egan because nothing in the record indicates that Dr. Nelson's

statements played a role in St. Anthony's decision to revoke Dr. Egan's staff privileges. In its Report and Recommendation, the Appellate Review Committee expressly stated that, "[c]ontrary to Dr. Schlafly's assertion, the Appellate Review Committee finds the two cases [involving D.P. and H.S.] cited by the Hearing Committee as grounds for its decision [and] justify permanent suspension or revocation of Dr. Egan's privileges." Likewise, St. Anthony's Board of Directors, after reviewing the Appellate Review Committee's report and Dr. Schlafly's statement, unanimously decided to revoke Dr. Egan's staff privileges "due to poor medical judgment in two cases." Importantly, the two identified cases forming the basis for St. Anthony's decision to revoke Dr. Egan's staff privileges were completely unrelated to any allegation of Dr. Egan's discipline at other hospitals. *Cf. Storrs v. Lutheran Hosp. & Homes Soc. of Am., Inc.*, 609 P.2d 24, 29 (Alaska 1980) (concluding that the improper introduction of additional facts at hospital's appellate review that directly supported the arguments relied upon by the lower committee when revoking the physician's privileges was "contrary to the parties' agreement and was prejudicial to [the physician's] case.").

Arguing that he was prejudiced by Dr. Nelson's statements, Dr. Egan notes that Dr. Schlafly, in his written statement to the Board, described Dr. Nelson's remarks as "extremely prejudicial", and that Dr. Nelson's statements were in fact false.[6] However, neither the veracity of Dr. Nelson's statements nor Dr. Schlafly's assessment of Dr. Nelson's remarks play a determinative role in our analysis of whether Dr. Nelson's statements resulted in a violation of the Bylaws that fell below the

6. Dr. Egan testified before the Hearing Committee that he had never had a suspension, letter of reprimand, or other adverse action from any other hospital. Neither the MEC before the Hearing Committee nor St. Anthony's in this lawsuit challenged this testimony.

standard for substantial compliance. First, as discussed above, Dr. Egan's alleged discipline at other hospitals was not an articulated basis for St. Anthony's suspension of Dr. Egan's staff privileges. Second, Dr. Egan has not pointed to evidence in the record demonstrating that Dr. Nelson's remarks constituted any sort of basis for Dr. Egan's discipline. Third, a dissenting committee member's assertion that another member's remarks were "prejudicial" is not conclusive evidence that such remarks resulted in the type of prejudice that undermines the hospital's decision and warrants equitable relief, especially when that member's assertion finds no additional support in the record. Point denied.

### 2. Committee Member Bias

In his second point, Dr. Egan contends that trial court erred in finding that St. Anthony's substantially complied with its Bylaws and afforded Dr. Egan "substantive procedural fairness" because two members of the appellate committee, Dr. Nelson and the Chairman of the Appellate Review Committee, Joseph G. Lipic, were biased against Dr. Egan. As evidence of Dr. Nelson's and Chairman Lipic's alleged bias, Dr. Egan again refers exclusively to Dr. Schlafly's written statement. According to Dr. Schlafly's statement, in addition to Dr. Nelson's recounting of Dr. Egan's purported discipline at other hospitals, Dr. Nelson also described two personal experiences he had with Dr. Egan where he did not agree with Dr. Egan's professional judgment, and "Dr. Nelson indicated that he did not wish for Dr. Egan to practice any longer at St. Anthony's." With respect to Chairman Lipic, Dr. Schlafly asserted in his statement that Mr. Lipic dismissed his objections to Dr. Nelson's comments by claiming "that our meeting was not a legal hearing", and that "Chairman Lipic stated that Dr. Egan has mental deficiencies."

To ensure an impartial Appellate Review Committee, the Bylaws provide several procedural protections to prevent the participation of potentially biased committee members. Specifically, under Article X § 5:D of the Bylaws, three of the six appellate committee members are Medical Staff members selected by the affected practitioner. Additionally, the Bylaws provide that any Medical Staff member "whose adverse recommendation or action caused the hearing or who has acted as accuser, investigator, initial decisionmaker, or other active participant in the consideration of the matter leading up to the recommendation or action", or who is in "direct economic competition with the Affected Practitioner" may not serve on the Appellate Review Committee. Dr. Egan does not argue, and there is nothing in the record to suggest, that St. Anthony's failed to comply with these Bylaws when it assembled the Appellate Review Committee.

 Rather, Dr. Egan claims that equitable relief is necessary because Dr. Schlafly's written statement reveals that Dr. Nelson and Chairman Lipic were biased, which, in turn, deprived him of "procedural fairness." Where, as here, a hospital complies with its bylaws to assemble a neutral review committee, we decline to set aside the hospital's decision solely based on one committee member's allegations of improper remarks made by other members during their deliberations. Cf. *Travis v. Stone*, 66 S.W.3d 1, 4 (Mo. banc 2002) ("The general rule in Missouri is that a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict."). To scrutinize the statements made during the Appellate Review Committee's deliberations would impermissibly involve this

court in the substance of the committee's review, and improperly expand our limited judicial review of a hospital's "substantial compliance" with its bylaws. Point denied.

### 3. Defective Written Notice

 In his third point, Dr. Egan contends that trial court erred in finding that St. Anthony's substantially complied with its Bylaws because the written notice of charged "acts or omissions" did not notify Dr. Egan that he would be charged with failing to tell D.P. or her husband that her colostomy had to be revised because he brought the wrong limb of the bowel to the surface during the first surgery. We disagree.

Under Article X § 2:B of the Bylaws, "[t]he notice of hearing must contain a concise statement of the Affected Practitioner's alleged acts or omissions, a list by number of the specific or representative patient records in question, and/or the other reasons or subject matter forming the basis for the adverse action or recommendation." With respect to the case involving D.P., Dr. Egan's written notice described the case as follows:

> Patient admitted for treatment of decubits, STSG failed, to OR for diverting colostomy. Dr. Egan brought the wrong limb of bowel to the surface, Dr. Egan scheduled patient to return to surgery seven days later for revision, second opinion requested, Dr. Egan took patient to surgery very early (5:00 am) before second surgeon could see patient. Operative report does not reflect radiologic findings.

Additionally, the "concerns" listed about Dr. Egan's treatment of D.P. were "[o]verall surgical management, minimal or inaccurate documentation, questionable behavior and judgment."

At the hearing, while testifying about the circumstances involving D.P.'s case, Dr. Egan revealed that he did not advise the patient or her spouse that the wrong limb of the bowel had been brought up during the first surgery. Thereafter, Dr. Egan explained that he did not fully disclose the result of the first surgery because "some people can't handle all the truth" and he did not "think it would have been helpful to the husband or the patient." Subsequently, the Hearing Committee, in its Report and Recommendation, found that in D.P.'s case:

> Dr. Egan failed to accurately document what actually occurred during the first surgery anywhere in the patient's medical record (specifically, his operative report), and failed to inform the patient or her family of his mistake. Dr. Egan justified his actions by opining that the family couldn't handle the truth. His failure to disclose the mistake to the patient and her family or to acknoedge that disclosure was required does not comport with the standard of care at this hospital, and subjected the other members of the treatment team to increased liability.

The Hearing Committee also concluded that, in D.P.'s case, "Dr. Egan violated the law and/or principles of medical ethics."

Given these facts, Dr. Egan's notice, which described Dr. Egan's error in the first colostomy and accused Dr. Egan of "minimal or inaccurate documentation" and "questionable behavior and judgment", was sufficient under the language of the Bylaws. Because the notice adequately apprised Dr. Egan that his treatment of D.P. was a potential basis for the suspension of his privileges, the fact that the notice did not specifically fault Dr. Egan for failing to fully inform D.P. or her family of the outcome of the first colostomy did not render the notice procedurally defective. *See Adkins v. Sarah Bush Lincoln Health Ctr.*, 129 Ill.2d 497, 136 Ill.Dec. 47,

544 N.E.2d 733, 742 (1989) ("Even if the issues discussed at the hearing could have been more precisely stated in the notice, the fact that the relevant charts were included was sufficient under the language of the bylaws and under basic notions of fairness to constitute adequate notice.").

In support of his argument to the contrary, Dr. Egan relies on case law involving a state agency's discipline of a licensed professional. These cases have recognized that "[p]rocedural due process requires that the complaint specify the exact basis for any disciplinary action against the licensee." *Sander v. Mo. Real Estate Comm'n,* 710 S.W.2d 896, 901 (Mo. App. E.D.1986). Dr. Egan contends that, under this standard, his notice was deficient and, consequently, he was deprived of an adequate opportunity to prepare his defense. Unlike state licensing agencies, however, a private hospital is not bound by the heightened requirements of constitutional due process, and these cases are inapplicable. *See Richardson v. St. John's Mercy Hosp.,* 674 S.W.2d 200, 201 (Mo. App. E.D.1984) (holding that *private* hospitals, unlike public hospitals, are not bound by the requirements of the Fourteenth Amendment). Rather, our review of a hospital's decision regarding its staff is for substantial compliance with its bylaws, and, here, St. Anthony's Bylaws provide sufficient requirements regarding fair notice, and the hospital substantially complied with those Bylaws. Point denied.

*4. 2004 Recommendations and Reports*

In his fourth point, Dr. Egan contends that trial court erred in finding that St. Anthony's substantially complied with its Bylaws because the Board of Directors based its decision on recommendations and reports from committees other than the Hearing Committee and the Appellate Review Committee. Specifically,

Dr. Egan contends that the Board of Directors improperly reviewed the reports prepared by the several hospital committees that had examined Dr. Egan's practice in 2004. Dr. Egan complains that he has never seen some of the reports, and that the reports were prepared without notice or a hearing, and included several cases that were not before the Hearing and Appellate Review Committees.

Dr. Egan's claim is without merit because, as Dr. Egan concedes in his brief, nothing in the Bylaws expressly restricts what the Board of Directors may review when rendering a final decision with respect to a disciplinary action. Instead, the only reference in the Bylaws regarding the Board's review is as follows:

Within forty-five (45) days after receipt of the recommendation of the Appellate Review Committee, the Board of Directors shall enter its decision. The decision of the Board of Directors, whether or not an appellate review was provided, shall be final and immediately effective. The Chief Executive Officer shall notify the Affected Practitioner of the final disposition of the case, and include a statement of the basis for the decision.

The record reveals that the Board of Directors complied with these express requirements of the Bylaws when reviewing Dr. Egan's case. Moreover, even had the Board's review of these reports been improper, there is no evidence that Dr. Egan was prejudiced as a result because the sole basis for the Board's decision, as described in its written statement to Dr. Egan, was the two cases properly before the Hearing and Appellate Review Committees. Point denied.

*5. "Exhibit B"*

In his fifth point, Dr. Egan contends that trial court erred in finding that St. Anthony's substantially complied with

its Bylaws because the Hearing Committee received *ex parte* reports of Dr. Egan's surgical procedures. For this point, Dr. Egan refers to an "Exhibit B" which is mentioned only in the MEC's "Proposed Report and Recommendation" submitted to the Hearing Committee after the close of the hearing, which stated:

> The Hearing Committee requested a basic analysis of Dr. Egan's surgical procedures in order to compare the complexity of his cases during the proctoring period with a comparable prior period. That analysis (see Exhibit B) shows that during the proctoring period Dr. Egan performed less than half the number of procedures than he performed during the comparable period, and the average time of procedures than he performed during the comparable period, and the average time of procedure during the proctored period fell to 28.44 minutes (from 92.89 minutes in the comparable period).

Dr. Egan claims that the MEC's apparent *ex parte* submission of "Exhibit B" violates several requirements of the Bylaws, which mandate that: (1) "[u]pon the conclusion of the presentation of evidence, the hearing shall be closed." (2) "[t]he decision of the hearing committee shall be based on the evidence introduced at the hearing, . . ." and (3) "[t]he proceedings by the appellate review body are a review based upon the hearing record."

As an initial matter, aside from the MEC's memorandum, there is no indication in the record of "Exhibit B's" contents or that the Hearing Committee actually received "Exhibit B". More importantly, there is no evidence that the Hearing Committee's alleged receipt of "Exhibit B" resulted in prejudice to Dr. Egan. The Hearing Committee's Report and Recommendation did not adopt the above quoted language from the MEC's proposed recommendation, and makes no mention of "Exhibit B." All of the Hearing Committee's findings were supported by testimony and evidence properly admitted at the hearing, and there is nothing to indicate that the purported submission of "Exhibit B" altered the Hearing Committee's findings and recommendation. *See Brinton v. IHC Hosp's., Inc.*, 973 P.2d 956, 971–972 (Utah 1998) (holding that even if the physician's allegation that the hospital refused to provide him statistical data was true, the physician "failed to demonstrate the prejudice necessary to maintain a claim that the Hospital did not substantially comply with its Bylaws" because there was "no credible evidence that such data could have altered the panel's finding. . . ."). Point denied.

*6. Improper Use of Counsel's Arguments*

■ In his sixth point, Dr. Egan contends that trial court erred in finding that St. Anthony's substantially complied with its Bylaws because the MEC, the Hearing Committee, and the Appellate Review Committee improperly used an argument of Dr. Egan's counsel from his post-hearing memorandum as evidence that Dr. Egan had "not accepted responsibility for his actions" in the case involving H.S. Dr. Egan, however, did not raise this theory at trial, and we will not find that a trial court committed error for failing to consider theories not presented to it. *Dickens v. Mo. Dept. of Health & Senior Serv's.*, 208 S.W.3d 281, 283 (Mo.App. E.D.2006). Point denied.

### Conclusion

Based on the foregoing, we find that the trial court did not err in determining that St. Anthony's substantially complied with its Bylaws before revoking Dr. Egan's

staff privileges. The judgment is affirmed.

KURT S. ODENWALD, P.J., and GLENN A. NORTON, J., Concur.