STEPHEN HARRIS *v.* BRADLEY MEMORIAL
HOSPITAL AND HEALTH
CENTER, INC.
(SC 18068)

Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

---

Argued October 27, 2009—officially released May 18, 2010

318

*P. Jo Anne Burgh*, for the appellant (plaintiff).

*Michael G. Rigg*, with whom, on the brief, was *Roland F. Young III*, for the appellee (defendant).

*Opinion*

McLACHLAN, J. This appeal arises from the summary suspension of the medical privileges of the plaintiff, Stephen Harris, a physician, by the defendant, Bradley Memorial Hospital and Health Center, Inc. The plaintiff appeals from the judgment of the trial court in favor of the defendant, rendered following the court's grant of the defendant's motion for judgment notwithstanding the verdict and for remittitur, following a jury verdict in favor of the plaintiff.[1] The plaintiff claims that the

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

trial court improperly: (1) concluded that the favorable termination doctrine applies in the context of an action brought by a physician seeking damages in connection with a hospital's suspension or termination of that physician's privileges; (2) reached the merits of the defendant's motion for remittitur despite the fact that it had rendered judgment in favor of the defendant on the basis of the favorable termination doctrine; (3) granted the defendant's motion for remittitur; (4) declined to award the plaintiff punitive damages; and (5) granted the defendant's motion for a directed verdict as to the plaintiff's claim pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., concluding that the defendant's summary suspension of the plaintiff's privileges was not a commercial decision covered by CUTPA. The defendant claims that the judgment of the trial court may be affirmed on the basis of one or all of the following alternate grounds: (1) the trial court properly concluded that the defendant substantially had complied with its bylaws when it suspended the plaintiff's surgical privileges; (2) the plaintiff failed to rebut the statutory presumption that the defendant was immune from monetary liability under the federal Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq.; and (3) the plaintiff was collaterally estopped from bringing this action by virtue of a consent order into which he and the department of public health had entered. Because we agree with the plaintiff that the court improperly applied the favorable termination doctrine, and disagree with the defendant that the judgment of the trial court may be affirmed on the basis of the alternate grounds raised, we reverse the judgment of the trial court granting judgment notwithstanding the verdict. Additionally, we reverse the court's grant of judgment notwithstanding the verdict with respect to the jury's award of punitive damages to the plaintiff.

We affirm the judgment of the trial court, however, granting the defendant's motion for directed verdict as to the plaintiff's CUTPA claim and granting the defendant's motion for remittitur.

The jury could have found the following relevant facts. The plaintiff, a general surgeon, was admitted to the defendant's medical staff and granted privileges in 1993. His privileges most recently had been renewed in 1999. Beginning in 1997, the plaintiff also held privileges at New Britain General Hospital. The plaintiff's practice was busy, averaging about twenty-five to forty cases a month and requiring him to be in the operating room three to four times a week. In addition to serving as the primary surgeon for his own cases, he assisted other general surgeons in the operating room, primarily Ambrose Alfonsi, the chairman of the defendant's surgery department, and Joshua Morowitz, the vice-chairman of the defendant's surgery department. The defendant's medical staff reappointment summary of 1999 reported that in the two years preceding the plaintiff's reappointment, he had 495 hospital admissions, 551 surgical procedures, 136 consultations, two suspensions for medical records violations, a mortality rate of two out of 495, an average length of stay of 6.6 days and a complication rate of zero.

In December, 1999, a patient on whom the plaintiff had performed a laparoscopic cholecystectomy returned twenty-four hours following the procedure with right upper quadrant pain and elevated liver enzymes. The patient was transferred to Hartford Hospital and treated for an injury she had sustained to her common duct during the laparoscopic procedure. The case was reviewed the following month during a morbidity and mortality meeting.[2] Subsequent to that

[2] As part of the hospital's quality assurance peer review process, morbidity and mortality meetings provided an opportunity for the department of surgery to review both general monthly statistics regarding outcomes, lengths of stay, complications, infections, and other matters, and individual cases

review, Alfonsi proposed a six month period of observation, during which Alfonsi would assist and observe the plaintiff in his laparoscopic surgery cases.[3] The plaintiff agreed and in June, 2000, at the end of the proposed supervision period, Alfonsi expressed satisfaction with the plaintiff's performance and removed the restriction on his practice.

In September, 2000, Alfonsi retired as chairman of the department of surgery and Morowitz became chairman in his place. Sometime in early to mid-November, 2000, Clarence Silvia, the defendant's president and chief executive officer, called the plaintiff to a meeting with Silvia, Morowitz and Letterio Asciuto, the president of the medical staff. During the meeting, they informed the plaintiff that because they had concerns about his clinical capabilities, they were going to contact an outside reviewer to analyze his cases.

Although the plaintiff was unaware of it at the time of the November meeting, the proposed external review had, in fact, already been conducted by Randolph Reinhold, a general surgeon and the chairman of the department of surgery at the Hospital of Saint Raphael in New Haven. Silvia and Morowitz had decided to seek external review of the plaintiff's cases in October in response to concerns expressed by nurses who worked in case management quality assurance. Silvia had instructed Elaine Greene, the defendant's director of nursing and chief operating officer, to select a representative sample of the plaintiff's cases to be sent to Rein-

selected each month by quality assurance nurses. The attending surgeon for each individual case being reviewed presented a synopsis of the case. Following a discussion, the attending members ordinarily reached a consensus regarding whether further action was warranted, including, but not limited to, further investigation or a reprimand of the physician in question.

[3] John Russell, a general surgeon who served at the time as chairman of surgery at New Britain General Hospital, had agreed to be available as backup for Alfonsi during that period, but his services were never needed.

hold. Greene sent twenty patient charts to Reinhold, selecting only those that had been presented for peer review at morbidity and mortality meetings. When Reinhold completed his review of the charts, he found that: (1) twelve out of the twenty cases demonstrated evidence of error in surgical technique or management; (2) of those twelve errors, nine led to significant adverse outcomes including death; and (3) only six out of the twenty cases were free of complications. Reinhold concluded, on the basis of those findings, that if the sample was representative of the plaintiff's practice, the pattern of errors and complications was widely deviant from accepted standards of surgical care. There was no evidence that Reinhold had been informed that the sample was not random.

In December, 2000, the plaintiff was informed that the report had been returned and, because the report was unfavorable, the defendant's medical executive committee had decided to form a peer review panel for the purpose of conducting further review of his cases. He was not informed, however, who would be on the peer review panel, when the panel would be formed and begin work, or what, precisely, the panel would review. Nor was he informed that the medical executive committee's decision was based on the recommendation of Morowitz, who had requested and been given the authority to convene the peer review panel.

In addition to the twenty charts reviewed by Reinhold, Morowitz, who admitted that he was the plaintiff's direct economic competitor, selected thirteen additional charts for review by the peer review panel[4] by

---

[4] The plaintiff claims in his reply brief that Morowitz selected only sixteen of the charts that Reinhold reviewed, and selected an additional seventeen charts. In support of that claim, the plaintiff supplies a chart that he created for purposes of appeal. We rely instead on testimony presented at trial that Morowitz used the twenty cases that had been reviewed by Reinhold and selected thirteen additional charts.

reviewing more than 200 of the plaintiff's cases from the years 1998 through 2000, and weeding out any charts that did not present a question of the plaintiff's clinical competence. He acknowledged that he intentionally did not select a random sample and that he had never applied this methodology of selection in any prior review of a physician's patient care. He also stated, however, that he explained to the peer review panel members the methodology he had employed in selecting the thirteen charts.

Morowitz also supplied the peer review panel members with a statistical summary he had prepared on the basis of his review of the plaintiff's cases, but he did not give the panel members the medical staff reappointment summary of 1999 that had summarized the plaintiff's cases for the two years prior to the plaintiff's renewal of privileges, nor did he review that information in compiling his statistical summary of the plaintiff's practice. Morowitz did not check to see if any of the cases that he selected had been screened at the morbidity and mortality meetings, and he did not make any information from those meetings available to the peer review panel members. His statistical summary reported that during the three year period covered by the review, the plaintiff performed a total of 313 procedures, and calculated a rate of error of 13 percent for major procedures and 3 percent for minor procedures, with a combined rate of error of 8 percent.

The plaintiff's first notice that the peer review panel had been formed was on January 29, 2001, when he was summoned before it. The peer review panel, comprised of John Russell, a general surgeon who served at the time as chairman of surgery at New Britain General Hospital, Daniel Scoppetta, a general surgeon and chief of staff at Bristol Hospital, and Jack Huse, a general surgeon and former chairman of the department of surgery at the Midstate Medical Center, had held its first

meeting on January 15, 2001, at which time they began their review of the thirty-three charts that Morowitz had provided to them. The peer review panel's second meeting, on January 29, 2001, was already underway when the members summoned the plaintiff so that he could respond to their questions about the cases. When he arrived at the meeting, Silvia and Morowitz were present, along with the three peer review panel members. During the meeting, when the peer review panel members had questions about a patient chart, Morowitz placed that chart in front of the plaintiff and the panel members questioned the plaintiff about the case. The plaintiff had been given no prior notice of the meeting, no opportunity to review the charts beforehand to refresh his memory of the cases, and although there was information in his office records that would have been relevant during the peer review process, the plaintiff was given no opportunity to consult those records prior to or during the course of the meeting. The plaintiff conceded that he did not request to be excused so that he could have time to prepare for questioning.

Following the January 29, 2001 meeting, the peer review panel prepared a report summarizing their findings. On the basis of their review, and in light of the statistical summary provided by Morowitz, which was appended to the report, the peer review panel concluded that the overall surgical care provided by the plaintiff during the period of time reviewed did not meet the standard of care expected of a board certified general surgeon. That report was submitted to Silvia on February 7, 2001. The reports of both the peer review panel and Reinhold were presented at the February 13, 2001 meeting of the medical executive committee, which summarily suspended the plaintiff's privileges effective that day and limited his privileges to first assist only in the operating room.

After the plaintiff sought review of the medical executive committee's action pursuant to the defendant's medical staff bylaws,[5] a hearing panel was convened to hear the plaintiff's appeal. Following six days of hearings, during which the hearing panel heard testimony from the plaintiff and witnesses for the defendant, the hearing panel found that the plaintiff had not met his burden of proving that the medical executive committee's decision suspending his privileges was unreasonable, not sustained by the evidence or otherwise unfounded. On the basis of its findings, the hearing panel also recommended that the summary suspension be continued. The defendant's board of directors (hospital board) rejected the plaintiff's appeal from the decision of the hearing panel on September 30, 2002.

The plaintiff subsequently brought the present action, alleging breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with business expectancies and a violation of CUTPA, seeking both damages and injunctive relief. Some time after the plaintiff instituted this action, the department of public health (department), through an independent consultant, reviewed twelve of the plaintiff's surgical patient charts. The consultant concluded that the plaintiff's care for the reviewed patients failed to meet the applicable standard of care. Rather than contest the findings, the plaintiff agreed to enter into a consent order with the department, pursuant to which the plaintiff agreed to a restriction in his medical license barring him from performing any surgical procedure in any

---

[5] The plaintiff sought review pursuant to article VI of the defendant's medical staff bylaws, entitled Hearings and Appeals, which provides: "Section 1. When a Hearing May Be Requested

"A. Initiation of Hearing

"Recommendations or Actions. The following recommendations or actions shall, if deemed adverse pursuant to paragraph B., entitle the practitioner affected thereby to a hearing . . .

"10. Suspension of clinical privileges . . . ."

setting. The order further provided that the restriction would remain in effect until and unless the department and the state medical examining board were to approve an application by the plaintiff to resume his surgical practice. The order expressly stated that the plaintiff did not concede the truth of the findings of the department's independent consultant, and referred to the present action challenging the defendant's termination of the plaintiff's privileges. For purposes of any proceedings before the state medical examining board, however, the consent order was to have preclusive effect as though all of the allegations therein had been proven.[6]

The defendant filed two motions for summary judgment prior to trial.[7] In its first motion for summary judgment, the defendant argued that it was immune from liability pursuant to the Health Care Quality Improvement Act of 1986 (act), 42 U.S.C. § 11101 et seq.[8] Because the court, *Burke, J.*, found that the plaintiff had presented no evidence challenging the defendant's compliance with the statutory criteria of the act in con-

---

[6] Because the scope and effect of the consent order are expressly limited to proceedings before the state medical examining board, and because the order expressly acknowledges both that by entering into the consent order the plaintiff was not admitting any wrongdoing with respect to his care of surgical patients and that the plaintiff had challenged the revocation of his privileges in the present action, the defendant's claim that the plaintiff was collaterally estopped from bringing this action by virtue of his having entered into the consent order has no merit.

[7] The defendant had filed a third motion for summary judgment on May 17, 2007, but the trial court declined to consider that motion because it had been filed in violation of the court's scheduling order and without the permission of the court.

[8] Title 42 of the United States Code, § 11111 (a) (1), provides in relevant part that if a "professional review action" by a "professional review body" meets certain statutory prerequisites, the professional review body and any persons who act as members or staff of the body, under contract or other formal agreement with the body, or who participate with or assist the body with respect to the action, "*shall not be liable in damages* under any law of the United States or of any State (or political subdivision thereof) with respect to the action. . . ." (Emphasis added.)

nection with proceedings subsequent to the February 13, 2001 summary suspension of the plaintiff's privileges, the court granted the defendant's motion for summary judgment as to the plaintiff's claims for damages arising from proceedings after that date.[9] The court denied the motion with respect to the plaintiff's claim for damages sought in connection with events leading up to and including the summary suspension. The court also denied the defendant's motion with respect to the plaintiff's claim for injunctive relief because the act provides immunity only with respect to damages. See footnote 8 of this opinion.

In its second motion for summary judgment, the defendant argued that it was immune from liability for damages with respect to proceedings prior to and including the February 13, 2001 summary suspension of the plaintiff's clinical privileges on the basis of the emergency provision of the act as set forth in 42 U.S.C. § 11112 (c).[10] The defendant also argued that the con-

---

[9] Title 42 of the United States Code, § 11112 (a), provides in relevant part that, for immunity to attach pursuant to the act, the professional review action must be taken "(1) in the reasonable belief that the action was in the furtherance of quality health care,

"(2) after a reasonable effort to obtain the facts of the matter,

"(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

"(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

"A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in [42 U.S.C. § 11111 (a)] . . . unless the presumption is rebutted by a preponderance of the evidence."

[10] Title 42 of the United States Code, § 11112 (c), provides: "Adequate procedures in investigations or health emergencies

"For purposes of section 11111 (a) of this title, nothing in this section shall be construed as—

"(1) requiring the procedures referred to in subsection (a) (3) of this section—

"(A) where there is no adverse professional review action taken, or

"(B) in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action; or

sent order entered into by the department and the plaintiff collaterally estopped the plaintiff from litigating the issue of whether his surgical care fell below the applicable standard of care, and therefore justified a grant of summary judgment both as to the plaintiff's claims for damages and injunctive relief. The court, *Shaban, J.*, denied the motion.

The plaintiff's remaining claims for damages went to trial, with the claim for injunctive relief to be tried concurrently and decided by the court following the jury's verdict. After the plaintiff had presented his case, the court granted the defendant's motion for a directed verdict as to count four of the complaint, which alleged a CUTPA violation. The court reserved decision on the remainder of the motion. The jury returned a verdict in favor of the plaintiff, awarding $250,000 in economic and noneconomic damages, plus punitive damages to be determined by the trial court. Following the return of the jury's verdict, the court denied the plaintiff's request for a permanent injunction requiring the defendant to cease and desist both the termination of the plaintiff's medical privileges and any interference with the plaintiff's patient relationships. The court recognized that the plaintiff sought injunctive relief on the same bases on which the jury had arrived at its verdict in favor of the plaintiff, namely the counts alleging breach of contract and breach of the implied covenant of good faith. For purposes of the claim for injunctive relief, however, the court noted that it, not the jury, was the finder of fact. See Practice Book § 16-11 ("[a] case presenting issues both in equity and law may be claimed for the jury list, but, unless the judicial authority otherwise orders, only the issues at law shall be assigned for trial by the jury").

"(2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual."

The court began by articulating the applicable standard for review of a hospital's decision to discipline a physician. This court had explained in *Owens* v. *New Britain General Hospital*, 229 Conn. 592, 606–607, 643 A.2d 233 (1994), that judicial review of a hospital's exercise of its discretion concerning whether and to what extent a physician is entitled to staff privileges is limited to a determination of whether "the hospital substantially complied with its applicable bylaw procedures." Applying that standard, the trial court stated that none of the defendant's bylaws required any particular procedure in connection with the summary suspension of a physician's privileges. The only applicable bylaw is article V, § 1, A, which provides in relevant part that "[t]he [e]xecutive [c]ommittee of either the [m]edical [s]taff or the [g]overning [b]ody shall have the right to summarily suspend the admitting and/or clinical privileges of a practitioner, upon a determination that action must be taken immediately in the best interest of patient care in the hospital or when there is a potential immediate risk to the well being of patients, employees or visitors. . . ." The court then detailed the process that the defendant provided to the plaintiff in connection with his summary suspension—namely, that it informed the plaintiff of the external review by Reinhold, that Reinhold's report was unfavorable, and that it provided to the plaintiff a copy of that report and a second peer review, with the opportunity for the plaintiff to respond to questions by the peer review panel members during their second meeting. Because none of these procedures specifically were required by the bylaws, the court concluded that the plaintiff had been provided with more process than was required by the bylaws and had failed to satisfy his burden of showing that the summary suspension was not in substantial compliance with the bylaws.

As to the postverdict motions of the parties, the court granted the defendant's motion for judgment notwith-

standing the verdict on the ground that the plaintiff's claim was barred by the favorable termination doctrine. With respect to the plaintiff's motion for punitive damages, which the jury had awarded in connection with count three of the complaint, alleging tortious interference with business expectancies, the court concluded that although there was sufficient evidence of tortious interference with business expectancies, there was insufficient evidence that the defendant had acted with an intent to injure or with reckless disregard of the plaintiff's rights. On that basis, and because it had found that the plaintiff failed to show that the underlying action had terminated in his favor, the court denied the plaintiff's motion for punitive damages. Although the court recognized that it was "technically unnecessary" for it to reach the merits of the defendant's motion for remittitur, it did so because it presented a discretionary matter for the trial court, rather than a pure question of law. The court granted the motion and reduced the award of noneconomic damages from $200,000 to $100,000.[11] This appeal followed.

I

We first address the plaintiff's claim that the trial court improperly concluded that the favorable termination doctrine applies to a physician's action seeking damages in connection with a hospital's decision suspending or terminating that physician's privileges. The plaintiff argues that the favorable termination doctrine is inapplicable in this context and that the proper test is the test articulated in *Owens*. We agree.

To establish a cause of action for either vexatious litigation or malicious prosecution, a plaintiff must "prove want of probable cause, malice and a termination of suit in the plaintiff's favor." *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). "[W]e have

[11] The court denied as moot the defendant's motion to set aside the verdict.

always viewed the issue of whether the prior outcome was 'favorable' to the plaintiff as relevant to the issue of probable cause." *DeLaurentis* v. *New Haven,* 220 Conn. 225, 251, 597 A.2d 807 (1991). We have stated that the doctrine applies even when the prior proceeding on which the subsequent claim is based is an administrative proceeding. Id., 248–49. We have articulated two public policy concerns underlying the application of the favorable termination doctrine. "The first is the danger of inconsistent judgments if defendants use a vexatious suit or malicious prosecution action as a means of making a collateral attack on the judgment against them or as a counterattack to an ongoing proceeding. . . . The second is the unspoken distaste for rewarding a convicted felon or otherwise 'guilty' party with damages in the event that the party who instituted the proceeding did not at that time have probable cause to do so. . . . Thus, an underlying conviction is recognized in this state as conclusive proof that there was probable cause for the charges unless it is proven that the conviction was obtained through fraud, duress or other unlawful means." (Citations omitted.) Id., 251–52.

The trial court concluded that the policy reasons underlying the favorable termination doctrine supported its extension to this particular context, that is, an action seeking damages in connection with a hospital's adverse privileging decision. The court reasoned that the jury's verdict finding that the plaintiff had proven that, in summarily suspending the plaintiff's privileges, the defendant had breached its contract with the plaintiff, breached the covenant of good faith and fair dealing and tortiously interfered with the plaintiff's business relations was inconsistent with the defendant's final decision, through the hospital board, affirming the hearing panel's conclusion that the medical executive committee had acted reasonably in summarily suspending the plaintiff's privileges. The court also reasoned that

the jury's verdict provided a windfall to the plaintiff, allowing him to recover damages for the summary suspension despite the unchallenged final termination of the plaintiff's privileges by the hospital board.

The trial court acknowledged that the extension of the favorable termination doctrine in this context "does not fully square with Connecticut law." In concluding that the doctrine should nonetheless be extended to this context, the court relied on *Westlake Community Hospital* v. *Superior Court of Los Angeles County*, 17 Cal. 3d 465, 469, 551 P.2d 410, 131 Cal. Rptr. 90 (1976), in which the Supreme Court of California held that before a physician could bring a tort action for damages in connection with a hospital's adverse privileging decision, the physician "must first succeed in setting aside the quasi-judicial decision in a mandamus action . . . ." This rule, the court reasoned, was consistent with California's established, statutory procedure directing that judicial review of administrative decisions be sought by filing a writ of mandamus. Id., 484; see also Cal. Civ. Proc. Code § 1094.5 (Deering 2010). The court also reasoned that the rule guaranteed a "uniform practice of judicial, rather than jury, review of quasi-judicial administrative decisions." *Westlake Community Hospital* v. *Superior Court of Los Angeles County*, supra, 484. Finally, the court observed that the rule would protect those who are charged with engaging in peer review. Id.

In considering whether to adopt a new rule, we weigh the various public policy reasons for and against the proposed new rule. See, e.g., *State* v. *Wright*, 273 Conn. 418, 426, 870 A.2d 1039 (2005) (rejecting defendant's invitation to adopt new rule allowing defendants to collaterally attack validity of criminal protective order because collateral bar rule "advances important societal interests in an orderly system of government, respect for the judicial process and the rule of law, and

the preservation of civil order"); *State* v. *Brocuglio*, 264 Conn. 778, 788–89, 826 A.2d 145 (2003) (adopting new crime exception to exclusionary rule because public policies advanced by exclusionary rule not advanced by applying doctrine to new crimes, and extension of rule to new crimes would risk encouraging violent response to unlawful police conduct); *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 174–75, 646 A.2d 195 (1994) (declining to adopt rule excusing attorneys from liability for negligently advising client to enter into settlement agreement; public policy of encouraging pretrial settlement of claims outweighed by more important public policy interest of requiring diligent exercise of skill and learning by attorneys in advising clients). Accordingly, it is helpful first to review our existing rule, and the public policy interests served by it. In *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 557 A.2d 1249 (1989), this court concluded that "administrative decisions by [a] hospital affecting [a] plaintiff's rights as a medical staff member under the bylaws [are] . . . subject to judicial review." *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 602–603, citing *Gianetti* v. *Norwalk Hospital*, supra, 59, 62. In *Owens*, we explained the public policy concerns underlying the imposition of a legal obligation on hospitals to adhere to the bylaws: "The privilege to admit and treat patients at a hospital can be critical to a doctor's ability to practice his [or her] profession and to treat patients. Both doctors and patients can suffer if otherwise qualified doctors are wrongly denied staff privileges. . . . Consequently, hospitals must treat physicians fairly in making decisions about their privileges because patients need physicians and they, in turn, need hospital privileges to serve their patients. Therefore, in establishing standards for granting or maintaining staff appointment or clinical privileges, hospitals must ensure that these standards are rationally related to the delivery of

quality health care to patients. . . . The public has an interest that staff decisions are not made arbitrarily. By requiring hospitals to adhere to their bylaws, the risk of arbitrary decisions is reduced." (Citations omitted; internal quotation marks omitted.) *Owens* v. *New Britain General Hospital*, supra, 605–606.

The same overarching public policy concern that justifies requiring hospitals to adhere to their bylaws in making privileging decisions—namely, ensuring "the provision of quality medical care to the surrounding public community"—also requires that our review of a hospital's privileging decision must be highly deferential and narrow in scope. Id., 604. Judicial review of such decisions is limited to a determination of whether "the hospital substantially complied with its applicable bylaw procedures." Id., 606–607. It would be contrary to the public policy of ensuring that hospitals provide quality healthcare if members of the judiciary were to "substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." (Internal quotation marks omitted.) Id., 606. Simply put, our deferential standard of review recognizes that quality health care is best ensured by leaving such decisions to the discretion of those who have the necessary expertise to make them.

In concluding that the favorable termination rule should be adopted, the trial court relied on the public policies that would be served by applying the doctrine in this context—namely, avoiding inconsistent judgments and preventing a "guilty party" from receiving a windfall. We recognize that these two public policies are significant, and that requiring a physician, consistent with the favorable termination doctrine, successfully to seek injunctive relief setting aside the decision of a hospital board before pursuing a claim for damages would also serve the interests of judicial economy by

preventing the waste of judicial resources evidenced by the present case, in which a jury was impaneled, heard evidence over a period of weeks, and deliberated, only to have the court render judgment for the defendant notwithstanding the verdict.[12] Those interests, however, are outweighed by the more important public policy of ensuring that hospital decision makers are guided only by a concern for ensuring quality health care. That public policy, which is furthered by our current, deferential level of review of hospital privileging decisions, would be seriously undermined by the application of the favorable termination doctrine in this context. We emphasize that it is not a hospital board's nature as an administrative type decision maker that presents a policy problem. See *DeLaurentis* v. *New Haven,* supra, 220 Conn. 248–49. Rather, it is a hospital board's position as an extension of the hospital that renders the favorable termination doctrine inapplicable due to policy concerns. In fact, the key distinction between a hospital board hearing a physician's appeal from an adverse privileging decision and an administrative agency deciding a claim presented to it is that the hospital board is, in a sense, the hospital. A physician appealing to a hospital board essentially asks the hospital to rule that it acted wrongfully in its initial adverse decision. For the same reasons that we concluded in *Gianetti* that hospitals are legally obligated to abide by their medical staff bylaws, hospital boards must be permitted to remain neutral in hearing such appeals and to act only in the interest of ensuring quality health care. If a hospital board's reversal of a peer review panel's recommendation to suspend or terminate a physician's privileges subsequently could be used against the hospital as evidence on the issue of favorable termi-

---

[12] There is no evidence in the record that the defendant ever sought to have the plaintiff's claim for injunctive relief tried to the court prior to the trial to the jury. Although the trial court had discretion to order the claim for injunctive relief tried first, no such order ever issued.

nation, the hospital board's objectivity would be compromised. By way of illustration, if a hospital board were to agree with a physician that the challenged peer review determination was not reasonable, it would subject the hospital to liability. Application of the favorable termination rule in this context, therefore, would not further the public policy interest of ensuring that the only principle guiding a hospital board's resolution of a challenge to a peer review determination is the provision of quality health care to the community and, consequently, would be inconsistent with the public policy goals that have guided our decisions governing review of hospital privileging decisions. Accordingly, we conclude that the trial court improperly extended the doctrine to this context, and, as a result, improperly granted the defendant's motion for judgment notwithstanding the verdict on that ground.

II

We next address the question of whether the trial court's judgment may be affirmed on the first alternate ground for affirmance raised by the defendant, namely, that the trial court properly could have concluded that no reasonable jury could have found that the plaintiff satisfied his burden of showing that the defendant did not substantially comply with its bylaws in the summary suspension process. We disagree.

We have stated that directed verdicts are disfavored because "[l]itigants have a constitutional right to have factual issues resolved by the jury." *Mather* v. *Griffin Hospital*, 207 Conn. 125, 138, 540 A.2d 666 (1988). Accordingly, "[o]ur review of a trial court's [decision] to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. [In determining whether the trial court has correctly set aside the verdict, we] must consider the evidence, including reasonable inferences which may

be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . . [We will uphold a trial court's decision to set aside the verdict and direct judgment] only if we find that the jury could not reasonably and legally have reached their conclusion." (Citation omitted; internal quotation marks omitted.) *Mulligan* v. *Rioux*, 229 Conn. 716, 726, 643 A.2d 1226 (1994).

As we explained in part I of this opinion, we accord highly deferential review to a hospital board's decisions regarding medical staff privileges. See *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 606–607. The question is whether a hospital substantially complied with its bylaws. Id. Consistent with substantial compliance review under *Owens* and our established standard of review of a trial court's decision to render judgment notwithstanding the verdict, our inquiry in the present case examines the evidence in the light most favorable to sustaining the verdict to determine whether the jury reasonably could have concluded that the plaintiff established that the defendant did not substantially comply with its bylaws.

In assessing whether a hospital substantially complied with its bylaws, we must be mindful of "the overarching function that medical staff bylaws are designed to serve—the provision of quality medical care to the surrounding public community. . . . Medical staff bylaws reflect what the medical community considers to be crucial to the effective administration of the hospital and the provision of quality medical care by physicians whose performance has earned them privileges. At the same time, the procedural protocol of the bylaws provide[s], outside of the judicial system, a fair method for making decisions concerning staff privileges." (Citation omitted; internal quotation marks omitted.) Id., 604. "[T]he obligation to follow medical staff bylaws is paramount and . . . a hospital must afford its medical

staff all the process and protections encompassed by its bylaws, because that obligation can stem from a contractual relationship between the hospital and the physician, a preexisting legal duty imposed by our state department of health regulations, and the public's substantial interest in the operation of hospitals, public or private. . . . [T]he public has an interest that staff decisions are not made arbitrarily. By requiring hospitals to adhere to their bylaws, the risk of arbitrary decisions is reduced." (Citation omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 20, 938 A.2d 576 (2008). Thus, although medical decisions are not for courts to assess, the question of whether a hospital has substantially complied with its practices and procedures is proper grist for the jury mill.[13]

In the present case, the only bylaw applicable to the summary suspension process is article V, § 1, A, which

---

[13] Indeed, the trial court's instructions to the jury made this very clear. "In order to prevail on this first count, the plaintiff must prove by a preponderance of the evidence that the defendant failed to substantially comply with these bylaw provisions. Under the substantial compliance standard, merely technical or minor violations in the procedures employed that do not result in material harm to the physician or otherwise undermine the result reached by the hospital will not rise to the level of breaches of the bylaws. Although a hospital is bound by its bylaws, your review of the defendant['s] . . . decision to suspend the plaintiff['s] . . . privileges should focus on the reasonableness of the action taken in relation to the interest of the plaintiff, the defendant and the public.

"In determining whether the [defendant] breached the substantial compliance standard, you are not allowed to substitute your judgment for that of the [defendant] . . . . You may consider whether it is appropriate to take into account the 2002 hospital proceedings concerning the plaintiff's hospital privileges. You are not, however, allowed to rely on your own personal opinion of [the plaintiff's] abilities. Instead, you must carefully consider whether the [defendant] . . . in summarily suspending the plaintiff's privileges, substantially complied with the applicable hospital bylaw requirements set forth in article V, § 1, A. In that regard, exhibit C, which you'll have concerning the 2002 proceedings, can be considered by you to explain the process used by the [defendant] but not to form your own opinion concerning the plaintiff's clinical skills or the quality of care that he rendered to patients."

provides in relevant part that "[t]he [e]xecutive [c]ommittee of either the [m]edical [s]taff or the [g]overning [b]ody shall have the right to summarily suspend the admitting and/or clinical privileges of a practitioner, *upon a determination that action must be taken immediately in the best interest of patient care in the hospital or when there is a potential immediate risk to the well being of patients, employees or visitors.* In instances where convening the entire committee may be practically impossible, and in the interest of time and immediate action, this right to summarily suspend may be delegated by either such committee to an individual member or representative of such committee. . . ."[14] (Emphasis added.) Although the trial court technically was correct in concluding that the bylaws do not require any *particular procedures* in connection with a summary suspension, article V, § 1, A of the bylaws, imposes a substantive requirement before the defendant may summarily suspend a physician's privileges. Specifically, the defendant may summarily suspend a physician's privileges only if a determination has been made that action must be taken immediately in the best interest of patient care or if there is potential immediate risk to the well-being of patients, employees or visitors. Either of these prerequisite circumstances requires "immediate" action. In the past, this court has turned to the dictionary for guidance when defining the term "immediate." See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 749 n.9, 865 A.2d 428 (2005), citing Black's Law Dictionary (6th Ed. 1990) (defining "immediate" as "[p]resent; at once; without delay . . . denot[ing] that action is or must be taken either instantly or without any considerable loss of time"). Although this period cannot be precisely defined and will vary according to the circumstances of a particular case, in view of the

---

[11] The plaintiff does not challenge the reasonableness or adequacy of the bylaws.

nature of the risk in failing to act, and the rights and interests of the patients whose well-being is at stake, the term reflects that there must be a finding of a sufficient emergency to warrant summary intervention.

In support of his claim that the defendant did not perceive the plaintiff's position on the medical staff as posing a potential immediate risk to patients, employees or visitors, or make a finding to that effect, and, therefore, did not substantially comply with the requirement of article V, § 1, A, of the bylaws, the plaintiff presented the following evidence. The defendant received Reinhold's unfavorable report by letter dated November 7, 2000. In response, the defendant commissioned the peer review panel to engage in a second, more comprehensive review of the plaintiff's cases. According to Scoppetta's testimony, after the peer review panel held its first meeting to review the plaintiff's cases on January 15, 2001, there had been no rush even to schedule the follow-up meeting with the plaintiff, which did not occur until two weeks later. On the contrary, Scoppetta testified that he expected that the meeting would be scheduled and he did not express any concerns about immediate harm or imminent threat. Nor did Morowitz, with whom the plaintiff had been scrubbing in, nor Asciuto, who continued to refer patients to the plaintiff, express concern that the plaintiff was posing an *imminent threat of harm* to his patients. On February 7, 2001, nine days after the second meeting on January 29, 2001, the peer review panel submitted its report to Silvia, concluding that the overall surgical care provided by the plaintiff during the time periods reviewed did not meet the standard of care expected of a board certified general surgeon. Upon receiving the report, Silvia did not immediately schedule a meeting of the medical executive committee to summarily suspend the plaintiff's privileges, nor did he seek to have the authority to do so delegated to an

individual member of the medical executive committee or a representative of that committee as is permitted under the bylaws. He did not discuss the report with the plaintiff, nor did he request that any member of the medical executive committee do so.

The report was presented to the medical executive committee on February 13, 2001, almost one month after the peer review panel's first meeting, and slightly more than three months after the defendant received Reinhold's unfavorable report. There was no evidence presented that the February 13, 2001 meeting of the medical executive committee had been called specifically to address the question of the plaintiff's privileges, and Silvia testified that the meeting was most likely the regularly scheduled monthly meeting. There is no indication in the minutes of the February 13, 2001 meeting, which were introduced into evidence, that the meeting was anything other than the regularly scheduled meeting. Moreover—and significantly—the minutes of the February 13, 2001 meeting of the medical executive committee reveal that, although the summary suspension was immediately effective, the committee did not make an express finding that the suspension was immediately necessary in the interest of patient care. Nothing in the letter that Silvia subsequently sent to the plaintiff advising him of the substance and basis of the medical executive committee's decision suggests that the committee made such a finding.

It is apparent, based on our review of the evidence offered by the plaintiff, that the jury reasonably could have found that the defendant did not comply with the requirement in article V, § 1, A of the bylaws, that the defendant could summarily suspend a physician's privileges only upon a finding that immediate action in the interest of patient care was required or if there was a potential immediate risk to the well-being of patients, employees or visitors. Although the requirement that a summary suspension must be justified by a sense of

urgency need not be interpreted to mean that a hospital must take instantaneous action, it does require that the defendant act with reasonable urgency under the circumstances. This case presents more than a mere technical breach of this requirement. Based on the extended time period over which the various protracted reviews took place, the way they were conducted, the admitted lack of any concerns about immediate harm or imminent threat by the members of the peer review panel and the failure of the medical executive committee to react to the peer review panel's findings other than as part of a regularly scheduled monthly meeting of the medical executive committee, and in the absence of any express finding by the committee that immediate action was necessary to protect patients, employees or visitors, the jury's finding that the defendant had not substantially complied with article V, § 1, A of the bylaws was amply supported by the evidence.[15]

## III

The defendant also argues that the judgment of the trial court may be affirmed on the alternate ground that the plaintiff failed to rebut the statutory presumption

[15] The defendant also argues that the plaintiff did not suffer material prejudice due to any defect in the summary suspension. The defendant contends that the hearing panel's subsequent determination "confirmed that the plaintiff did not conform to the standard of care expected of a general surgeon," and argues that the hearing panel's determination vitiated any possible taint. We reject this claim. First, the defendant's argument misconstrues the applicable standard in the summary suspension process. A determination by the hearing panel that the plaintiff failed to conform to the applicable standard of care would not necessarily provide support for the medical executive committee's summary suspension of the plaintiff, which had to comply with the "potential immediate risk" requirement of article V, § 1, A, of the bylaws. Second, as we have concluded, the defendant's suspension of the plaintiff was not in substantial compliance with its bylaws, and cannot be cured by subsequent proceedings that conformed to the bylaws because such a result would render meaningless the substantive rights to be afforded to a physician in connection with a summary suspension.

Finally, in deciding *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 592, we did not address or adopt the "material prejudice" analysis of the Appellate Court. See *Owens* v. *New Britain General Hospital*, 32 Conn. App. 56, 69, 627 A.2d 1373 (1993). The parties in the present case did not brief the issue of whether the Appellate Court's material prejudice analysis is or should be a part of the substantial compliance analysis that

that the defendant was immune from monetary liability under the Health Care Quality Improvement Act of 1986 (act), 42 U.S.C. § 11101 et seq. See footnotes 8, 9 and 10 of this opinion. The plaintiff responds that there was sufficient evidence to support the jury's finding that the defendant had failed to prove its special defense of immunity under the act by a preponderance of the evidence. Because the defendant has not challenged on appeal either the court's instructions to the jury regarding the defendant's special defense of immunity or the submission of the interrogatory to the jury on the defendant's special defense, we conclude that the defendant has failed to preserve its claim that the jury's finding that it was not entitled to immunity was not supported by the evidence.

Congress enacted the act in light of its findings that improving the quality of medical care is a national problem and that effective peer review, which is an important tool in ensuring quality medical care, is unreasonably discouraged by the threat of private money damage liability. Therefore, "[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101 (5). Accordingly, the act grants immunity from damages for those participating in a "professional review action" if the action was undertaken "(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." 42 U.S.C. § 11112 (a). Moreover, the

we set forth in *Owens* and we decline to address the issue. This case was litigated under that standard, however, and the jury was so instructed. See footnote 13 of this opinion. That instruction has not been challenged.

act incorporates a presumption, rebuttable by a preponderance of the evidence, that a professional review action has met the preceding standards. 42 U.S.C. § 11112 (a) (professional review action "shall be presumed to have met the preceding standards . . . unless the presumption is rebutted by a preponderance of the evidence"). Put simply, a plaintiff attempting to overcome the immunity protection of the act bears the burden of proving by a preponderance of the evidence that the professional review action was not undertaken in a reasonable manner. Title 42 of the United States Code, § 11112 (c) (2), further provides that, "where the failure to take such [a professional review] action may result in imminent danger to the health of any individual," the professional review action need not comply— at least initially—with the adequate notice and hearing requirement of 42 U.S.C. § 11112 (a) (3).[16]

The defendant consistently has claimed both at trial and before this court that it was entitled to immunity pursuant to 42 U.S.C. § 11112 (c) (2).[17] The defendant also consistently has asserted that it was entitled to the presumption of immunity set forth in 42 U.S.C. § 11112 (a), even if its immunity was grounded on 42 U.S.C. § 11112 (c) (2). The defendant raised this issue before the trial court, but the court disagreed, concluding that the presumption of reasonableness in 42 U.S.C. § 11112 (a)—applicable to the requirements set forth in 42 U.S.C. § 11112 (a) (1) through (4)—did not have any bearing on whether the defendant was entitled to a presumption under 42 U.S.C. § 11112 (c) (2) that the imminent harm showing had been met. Consistent with its conclusion, the court instructed the jury that the defendant bore the burden of proving its immunity

[16] See footnote 10 of this opinion.

[17] Although the defendant also claims on appeal that it is entitled to immunity because it has met the four requirements of 42 U.S.C. § 11112 (a), the defendant conceded in its motion for judgment notwithstanding the verdict that "the summary suspension preceded the notice and hearing procedures required by [42 U.S.C.] § 11112 (a) (3)." The defendant therefore has waived any claim to immunity on this basis.

defense by a preponderance of the evidence. Additionally, the interrogatories submitted to the jury included the following: "Did the defendant prove by a preponderance of the evidence its special defense of immunity under federal law?" The jury answered "[n]o" to the interrogatory. The defendant took an exception to the charge on the ground that it did not state that the defendant was entitled to a presumption of immunity, but did not object to the submission of this interrogatory to the jury. On appeal, however, the defendant has not claimed that the jury charge was improper, and does not claim that the interrogatory was submitted improperly to the jury.

The defendant's failure to challenge the jury charge and the submission of the interrogatory in this appeal, despite its claim that it was entitled to immunity under 42 U.S.C. § 11112 (c) (2) and that this court, in considering the defendant's claim, should assume that the defendant was entitled to the presumption in 42 U.S.C. § 11112 (a), is problematic. The defendant asks us to conclude that the trial court properly could have granted the motion for judgment notwithstanding the jury's verdict on this basis, yet does not claim that the jury was misled by an improper charge or interrogatory. The defendant asks us to decide the issue, therefore, under a standard that was never submitted to the jury for its consideration. Put another way, the defendant's argument appears to ask us to assume that, *if* the jury had been instructed in accordance with the defendant's interpretation of the act, placing the burden on the plaintiff to rebut the presumption that the defendant was entitled to immunity under 42 U.S.C. § 11112 (c) (2), the jury could not reasonably have concluded that the defendant was not entitled to immunity. That we cannot do—we cannot usurp the plaintiff's right to have the issues decided by the jury. The defendant cannot circumvent that right by asking us to decide a question that was never presented to the jury, in the absence of a claim that the jury was misled by an improper

instruction or interrogatory. The defendant's claim is unpreserved and we do not review it.

IV

We next address the plaintiff's claim that the trial court improperly denied the plaintiff's motion for punitive damages on the ground that, although there was sufficient evidence of tortious interference with business expectancies, there was insufficient evidence that the defendant had acted with the intent to injure or in reckless disregard of the plaintiff's rights. The plaintiff contends that the two conclusions are fundamentally inconsistent, that the trial court improperly substituted its own findings for that of the jury and that there was sufficient evidence to support the jury's finding that the defendant had the requisite intent necessary to justify the award of punitive damages. We agree with the plaintiff that there was sufficient evidence to support the jury's finding that the plaintiff was entitled to punitive damages.[18]

In order to establish that he was entitled to punitive damages, the plaintiff was required to show that the defendant's behavior evidenced "a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). Once again, we are mindful that in reviewing the trial court's decision to render judgment notwithstanding the verdict, we may affirm that decision "only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Mulligan* v. *Rioux*, supra, 229 Conn. 726. The question is not whether we would have arrived at the same verdict, but whether, when viewed in the light most favorable to sustaining the

[18] Because we agree with the plaintiff that there was sufficient evidence to support the jury's finding that the plaintiff was entitled to punitive damages, we need not address his remaining arguments, namely, that the two conclusions are inconsistent and that the trial court improperly substituted its own findings for that of the jury.

verdict, the evidence supports the *jury's* determination. See id.

The plaintiff presented the following evidence at trial in support of his claim that the defendant's conduct evidenced a reckless indifference to the plaintiff's rights or an intentional and wanton violation of those rights. Prior to the peer review investigation of the plaintiff's practice, his privileges had been renewed very recently, in 1999, with no stated concerns regarding the plaintiff's performance. Subsequent to the renewal of his privileges, when a concern did arise in connection with his performance of a laparoscopic procedure, the issue was resolved by Alfonsi's six month period of observation of the plaintiff's laparoscopic procedures, and at the end of that period, Alfonsi was satisfied with the plaintiff's performance and removed the restriction from his practice. It was only when Alfonsi retired as chairman of the surgery department and Morowitz, who testified that the direct economic competition between the plaintiff and himself was "significant," became chairman in his place that the peer review investigations that resulted in the plaintiff's summary suspension were initiated. Morowitz, Silvia and Asciuto first informed the plaintiff in November, 2000, that the first review, by Reinhold, was going to commence. By the time they informed the plaintiff that the review was pending, however, it had, in fact, already been completed. The charts that had been sent to Reinhold for review were not a representative sample of the plaintiff's practice, but represented *only* problem cases. The evidence suggested that Reinhold was unaware of that fact, and his letter setting forth his findings expressly stated that his conclusion was premised on the assumption that the sample was representative. The second peer review was commenced at the recommendation of Morowitz, who not only selected thirteen charts in addition to the twenty already reviewed by Reinhold—once again selecting only problematic cases—but also prepared his own "statistical summary" of the plaintiff's cases.

Although not a member of the peer review panel, Morowitz attended both meetings, and was present when the plaintiff was called before the peer review panel with only two hours notice. The plaintiff was required to answer the peer review panel members' questions without an opportunity to reference his own files or to review charts beforehand. The peer review panel's final report relied in part on the statistical summary that had been prepared by Morowitz.

The plaintiff had the right to expect that any summary suspension of his privileges would adhere to the requirement of article V, § 1, A, of the defendant's bylaws, that such suspension would be grounded "upon a determination that action must be taken immediately in the best interest of patient care in the hospital or when there is a potential immediate risk to the well being of patients, employees or visitors." As we already have noted in this opinion, the defendant never made the required determination. Even the preceding, brief summary of the evidence presented by the plaintiff is sufficient to support an inference that the defendant's investigation was contaminated by bias. Again, the question is not whether we would have drawn that inference. Once drawn by the jury, however, that inference is more than sufficient to support a finding that the defendant acted in reckless indifference of the plaintiff's rights. Thus, we agree with the plaintiff that the trial court improperly denied his motion for punitive damages.

V

The plaintiff claims that the trial court improperly reached the merits of the defendant's motion for remittitur and granted the motion, reducing the award of $200,000 for noneconomic damages to $100,000. The plaintiff argues that the court's grant of the motion for remittitur rested on factual findings that contradicted the factual findings underlying its grant of judgment notwithstanding the verdict. The plaintiff also contends that, because the court's ruling granting the motion for

judgment notwithstanding the verdict eliminated the jury's award of damages to the plaintiff, there were no damages at issue for purposes of the motion for remittitur and the court's decision granting remittitur was an impermissible advisory opinion. The defendant does not offer any argument in response to this contention and merely argues that the court's decision granting remittitur was substantively correct. We affirm the judgment of the trial court.

"The trial court may order a remittitur if it concludes, as a matter of law, that the verdict is excessive. General Statutes § 52-216a . . . ."[19] (Citation omitted.) *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 510, 652 A.2d 489 (1994). It is true that when the court ordered the remittitur, it already had vacated the jury verdict award of damages. The court acknowledged that it was "technically unnecessary" for it to reach the question of remittitur. That the court did so because it recognized the possibility that its decision might be reversed is evident from its explanation of why it reached the issue of remittitur: "the court does so because it is a discretionary matter for the trial court, rather than a pure question of law that an appellate court could just as easily decide." Principles of judicial economy persuade us that the trial court had the authority to address the defendant's motion for remittitur. Moreover, the court did not abuse its discretion in granting the motion. In concluding that the award was excessive, the court relied on the evidence presented of the plaintiff's injuries. Specifically, the court relied on the absence of any proof that the plaintiff had suffered any damage to his reputation, and, with respect to his emotional distress, the limited duration of any such distress from his summary suspension, as well as the absence of any physical

---

[19] General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

manifestations suffered as a result of emotional distress.

VI

Finally, we address the plaintiff's claim that the trial court improperly directed a verdict for the defendant on the plaintiff's claim alleging a violation of CUTPA. The plaintiff argues that the trial court improperly granted the defendant's motion for directed verdict on the ground that the defendant's decision was not subject to CUTPA because: (1) it was an employment decision; (2) it was a medical decision; and (3) it was not a competitive economic decision. Because we agree that the defendant's decision was a medical decision, we affirm the judgment of the trial court.[20]

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be

---

[20] Because we conclude that the defendant's decision was a medical one that was not subject to CUTPA, we do not reach the question of whether the decision was also an employment decision or a competitive economic decision.

unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Citations omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, supra, 285 Conn. 18–19.

In *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 38, 699 A.2d 964 (1997), we stated that "the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel." The challenged decision in the present case was one made by the defendant and was one directly related to "medical competence . . . ."[21] Id. The purpose of the peer review process is to ensure that only physicians who are professionally competent enjoy privileges at hospitals. See *Owens* v. *New Britain General Hospital*, supra, 229 Conn. 606 (characterizing hospital decisions regarding privileges as "determinations of the professional competence and capability of a physician to practice medicine in a hospital setting"). Such decisions do not fall within the ambit of CUTPA.

The judgment is reversed as to the grant of the motion for judgment notwithstanding the verdict and as to the

---

[21] Although the jury could have found that a possible bias or improper motive by Morowitz contaminated the peer review process, the trial court properly found that the defendant based its decision on medical competence.

denial of the motion for punitive damages, and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.